367 So.2d 800 (1979)
STATE of Louisiana
v.
Cynthia A. MOSES.
No. 62559.
Supreme Court of Louisiana.
January 29, 1979.
Rehearing Denied March 5, 1979.[*]
*801 Wendell E. Tanner, Slidell, for defendant-appellant.
*802 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Woodrow W. Erwin, Dist. Atty., Julian J. Rodrigue, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
SUMMERS, Chief Justice.
The Grand Jury of St. Tammany Parish jointly indicted Cynthia Moses and James Stacks for the January 21, 1977 murder of James Moses, the husband of Cynthia Moses. La.Rev.Stat. 14:30 (1976). On the State's motion James Stacks was ordered severed from the indictment and the State proceeded to trial against Cynthia Moses. La.Code Crim.Pro. arts. 704-706. The jury found her guilty of first degree murder. After a sentence hearing held pursuant to Articles 905-905.9 of the Code of Criminal Procedure, the jury recommended life imprisonment. The trial judge sentenced her accordingly. Defendant appeals her conviction and sentence, urging nine of ten assignments of error.
Evidence at the trial showed that on January 21, 1977, one Maurice Hodgson, a resident of Slidell was led to a site in the woods by the report of Cynthia Moses over a C.B. radio that a shooting had just occurred. Upon arrival at the scene Hodgson found Cynthia Moses, apparently distraught, beside the body of her husband James Moses. The victim had been shot by a high powered rifle.
An investigation ensued and as a result Cynthia Moses and James Stacks were arrested on February 2, 1977 and both were charged with first degree murder of James Moses.
It is the State's theory of the case that defendant and her paramour James Stacks planned the murder. The motive was twofold: to eliminate James Moses to permit the uninhibited continuation of the love affair of the conspirators, or to free Cynthia to marry Stacks; to permit the collection of $137,000, the proceeds of a policy insuring the life of James Moses.
To accomplish this design Cynthia lured her husband into the woods ostensibly for the purpose of lovemaking, the location having been the site of an amorous encounter before. Stacks was waiting there with a rifle to shoot the victim. However, when he lost his courage and could not pull the trigger, Cynthia went over to Stacks' hiding place, seized the weapon and fired the fatal shot.
The State's chief witness was Stacks himself who gave the police a statement detailing Cynthia's involvement in the crime in return for a plea bargain in which he agreed to plead guilty to manslaughter. On the strength of this statement, the testimony of police officers who overheard conversations between Stacks and defendant prior to their arrest, and the testimony of Stacks' former wife concerning declarations made by the defendant before the killing that she would either get a divorce from the victim or kill him, the State brought the case to trial.
Assignments 1 and 9: Before Stacks was severed from the indictment and prior to trial, he filed a motion to suppress testimony concerning a conversation between himself and defendant which had been overheard by officers of the Sheriff's office and the city police of Slidell. He was joined in this motion by the defendant. The motion was denied; and when testimony concerning the conversation was introduced at trial, the defense objected and those rulings are assigned as error.
Although no written motion appears in the record, the transcript indicates that the prosecutor acknowledged the fact that such a motion had been filed, and both the prosecutor and defense counsel seemed to agree to the issue presented by the motion to suppress.
At the hearing on the motion to suppress the testimony indicated that, on the night of January 28, 1977, during the course of their investigation into the death of James Moses, five officers of the Sheriff's office followed Cynthia Moses and James Stacks, who were traveling in separate cars until they met at a service station, at which time Cynthia entered Stacks' car. They then drove to the Star Motel in Lacombe, Louisiana. *803 Stacks registered, and he and Cynthia entered a room there.
Not being aware of the destination of the suspects, the officers had no opportunity to obtain a search warrant. Therefore they borrowed a key from the motel manager, who opened the door to an adjoining room which they entered. In addition, one of the officers remained in the motel office which adjoined the room occupied by Stacks and the defendant. From that vantage point the officer could overhear the conversation of Stacks and defendant through a closed door connecting the office to the room occupied by defendant and Stacks. In addition, other officers entered the adjoining room to which they had been admitted by the motel manager, where they too could overhear the conversation of defendant and Stacks.
No mechanical or electronic listening device was used by the officers. The conversation they overheard was audible without that assistance. At times the suspects raised their voices making their words more distinct and the need for listening devices unnecessary. Generally the officers stood near the wall and listened. At least two said they put their ears to the wall. One of the officers made notes of the conversation and with the assistance of the other officers later prepared a written report setting forth the substance of the conversation between Stacks and Cynthia Moses.
After 35 to 45 minutes the officers knocked on the door of the room occupied by defendant and Stacks, identified themselves, advised the occupants of their Miranda rights, and asked them to come to the sheriff's office for questioning. They were not placed under arrest, but accompanied the officers voluntarily, Stacks driving his own vehicle and Cynthia riding with one of the officers. After questioning, they were released and were arrested five days later.
At trial, Sergeant Bower testified to the substance of the motel conversation between Stacks and Cynthia. She feared Stacks had been spotted at the scene; that "only she knew he had pulled the trigger"; that they would divide the insurance proceeds in different bank accounts to confuse the police; and that the money would eventually go to the remodeling of defendant's home.
Defendant contended at the hearing that listening to the conversations amounted to a warrantless search and seizure without probable cause in violation of the Fourth and Fifth Amendments to the United States Constitution and the protection afforded by Article I, Section 5, of the Louisiana Constitution.
The argument made in support of this contention is based upon the decision in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), where the United States Supreme Court held that an officer's warrantless bugging of defendant's conversation in a phone booth was a violation of defendant's expectation of privacy, therefore the conversation overheard and the fruits thereof were suppressed.
Here, however, no electronic device was used to overhear the conversation of the suspects and no intrusion or entry was made into the room occupied by them. Other courts considering this question have given persuasive effect to this distinction and have concluded that this kind of unaided eavesdropping does not violate Katz. United States v. McLeod, 493 F.2d 1186 (7th Cir. 1974); United States v. Fisch, 474 F.2d 1071 (9th Cir. 1973); United States v. Llanes, 398 F.2d 880 (2d Cir. 1968); United States v. Perry, 339 F.Supp. 209 (D.C.S.D.Cal.1972). In Llanes, for example, narcotics agents stationed themselves outside the door to defendant's apartment. The door was not entirely closed, and conversation inside the apartment was clearly audible in the hallway. The Second Circuit refused to rationalize the case under the holding in Katz:
"[A]ppellant overlooks an important qualification placed upon the constitutional protection outlined in Katz, supra, which was an electronic eavesdrop case. In noting that the `Fourth Amendment protects people, not places,' Justice Stewart, writing for the majority, also observed that `What a person knowingly exposes to the public, even in his own *804 home or office, is not a subject of Fourth Amendment protection.' 389 U.S. at 351, 88 S.Ct. at 511 (emphasis supplied). We believe that conversation carried on in a tone of voice quite audible to a person standing outside the home are conversations knowingly exposed to the public. Compare the statement in the majority opinion in Hoffa v. United States, 385 U.S. 293, 303, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), quoting from the dissenting opinion of Mr. Justice Brennan in Lopez v. United States, 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963): `"The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak. "`In the same dissent Mr. Justice Brennan observed that eavesdropping and disguise `do not so seriously intrude upon the right of privacy' as does electronic eavesdropping, and that the `risk' referred to above changes crucially `as soon as electronic surveillance comes into play.' 373 U.S. at 465-466, 83 S.Ct. at 1402. In contrast to conventional eavesdropping, he noted, `there is no security from that kind of [electronic] eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy.' Id. at 466, 83 S.Ct. at 1402. (emphasis supplied). Thus appellant's reliance upon Katz is misplaced and we hold that appellant's Fourth Amendment rights were not invaded." 398 F.2d at page 884.
Katz and its progeny are basically concerned with the evils of electronic eavesdropping and the overwhelming intrusion on privacy the vast panoply of scientific listening devices create. That is not the situation in the case before us. There was in this case no search or seizure and no violation of defendant's right of privacy.
These assignments are without merit.
Assignments 3, 4, 5 and 6: After his arrest and indictment for first degree murder, Stacks gave a statement on January 10, 1978 in the presence of his attorney disclosing the part he played in the murder of James Moses.
He recited that Cynthia first mentioned killing her husband before Christmas 1976, asking him if he knew of anyone who would kill her husband for $4,000. When Stacks said he did not, she asked him if he would do it. He refused and the subject was dropped for some time. Later, after a plan to kill James Moses near Winterhaven, Florida, fell through, they agreed to kill him at a secluded spot in the woods by the lake near Slidell. When the appropriate time arrived, Cynthia telephoned Stacks to meet her and her husband at the prearranged site on January 21, 1977. Stacks repaired to the site armed with a rifle and took his position behind cover of bushes. Cynthia and her husband arrived at the appointed time, spread a blanket on the ground and drank beer for a while. When Stacks failed to shoot the husband, Cynthia excused herself on the pretense that she needed to relieve herself. She then sought out Stacks and, when he told her he couldn't do it, she took the gun and shot her husband. Stacks then fled, leaving Cynthia with the victim.
In addition he disclosed that on a previous occasion, Cynthia had planned to have her husband killed after she learned of the amount of insurance her husband's beneficiary would receive in the event he was killed, but the hired killer was arrested for selling drugs and sent to Angola, frustrating that plan.
At the trial Stacks was called as a witness for the State. He testified that he had been charged with the murder of James Moses and had agreed to plead guilty to manslaughter and receive a sentence of eighteen years in the penitentiary at hard labor. He then denied that Cynthia had ever discussed disposing of her husband with him. When asked if he remembered that statement of January 10, 1978 he said he did but it was false. He denied he was present when James Moses was killed. He did admit however that he had traded his shotgun for a rifle with Batten and that he had thrown it into a small lake after the *805 shooting, thereafter leading the police to the location where the gun was retrieved by a diver. He admitted making a statement to the effect that James Moses was killed with that rifle. He also admitted that he had told the prosecutor that morning that the statement was correct, and had reaffirmed its correctness just fifteen minutes before taking the witness stand. According to his testimony he had never before told anyone that this statement, which was exhibited to him on the witness stand, was false. And, he said, he made the false statement under threats made by a Deputy Sheriff and Stacks' own attorney that he would receive the death penalty.
He again testified that he remembered the statement exhibited to him by the prosecutor. When the prosecutor proceeded to introduce the contents of the statement to impeach Stacks' testimony on the grounds of surprise, defense counsel objected and the objection was overruled. The contents of the statement were then read to Stacks who admitted that he had made the statement as written.
By repudiating his prior statement and denying the truthfulness of the facts and circumstances therein relating to the murder, Stacks, who was the State's principal witness, testified upon a material matter against the State and in favor of the defendant. By doing so he took the State by surprise and thereby opened the door for the State to impeach his testimony by the prior inconsistent statement. La.Rev.Stat. 15:487-88; State v. Calloway, 324 So.2d 801 (1976); State v. Jackson, 309 So.2d 318 (1975); State v. McMellon, 295 So.2d 782 (1974).
This assignment of error is without merit.
Assignment 4: The defense contends that the trial judge committed error in allowing a police officer to testify that, in his opinion, a witness' answers to questions during interrogation were responsive.
The issue arose while Sergeant Drennan was being questioned by the prosecutor as a State witness under redirect examination. He had previously testified that he viewed the wounded, perhaps dead, victim at the scene, and that Cynthia was there at the time, very upset.
On redirect examination he testified that at the prosecutor's direction he took the statement of January 10, 1978 from Stacks. He testified that Stacks said he wanted to make a statement to tell the truth and "get it off his chest."
He was then asked if Stacks told him that he, Stacks, had been threatened, to which he answered, "No, sir, he did not." Asked if Stacks told him that he was afraid of the electric chair, Drennan replied that he did not. He also testified that Stacks did not say that Detective Rodriguez and Stacks' attorney told Stacks he was going to "get the electric chair."
The prosecutor then asked, "In your opinion, did the answers seem to be responsive to the questions you asked him?" Defense counsel objected to the prosecutor's effort to elicit opinion testimony, and the objection was overruled.
As the prosecutor argued, Detective Drennan was competent to testify whether the statement was free and voluntary and responsive, or compelled and evasive. While the question was phrased as an inquiry into the witness' opinion, in truth the prosecutor was seeking the witness' evaluation of the witness' attitude and credibility. As the experienced law officer interrogating Stacks, Detective Drennan was competent to form this judgment without being qualified as an expert. La.Rev.Stat. 15:464-67.
Previously Stacks had testified that he gave the answers freely and voluntarily, but that they were false.
Assignment 5: Later in his testimony Detective Drennan was asked whether Stacks seemed to be sincere when he said, "I thank God that I didn't have the courage to pull the trigger.", a declaration included in the January 10, 1978 statement. Although Drennan answered in the affirmative before the defense could object, defense counsel again objected that the witness could not give opinion testimony. The trial judge overruled the objection.
*806 Here again the answer called for did not involve a knowledge obtained by means of special training or experience. La.Rev.Stat. 15:464. All the witness was called upon to answer was the common sense inference to be drawn from his observation of Stacks' demeanor and credibility, a proper question under the circumstances.
Assignment 6: In later examination of Drennan the prosecutor asked him, "From what Jim Stacks told you in the statement and from what he showed you the same afternoon (referring to evidence of the crime in the field), did what he showed you coincide with what he told you in the statement?" Drennan replied, "Yes, sir, it did." He was then asked, "Did it sound to you like a statement which was being made up?" Defense counsel objected that the question called for the witness' opinion. The objection was overruled and the ruling was assigned as error. This assignment, lacks merits for the same reasons set forth in assignments 3, 4 and 5. It should be added that the experience of this officer in such matters also qualified him to draw these conclusions.
Assignment 7: Melba Whittennauer had formerly been married to Stacks. She was asked by the prosecutor whether Stacks and Cynthia had been going together prior to the murder of James Moses. The question was objected to after she answered in the affirmative. The objection was based upon the contention that no foundation had been laid, and "there should be inquiry as to how she acquired the knowledge as a foundation." Whereupon, the trial judge instructed the prosecutor to lay a foundation.
Thereafter, in response to questions, she testified that prior to the killing of James Moses she was working at George's Lounge in Slidell, a place frequented by Cynthia and Stacks. They were together between Christmas and January 1977. Prior to Christmas 1976 she heard Cynthia say that she wanted a divorce from her husband. After the testimony defense counsel requested that the jury be removed.
Out of the presence of the jury defense counsel argued that he had received no notice that the prosecutor would seek to establish inculpatory statements of the defendant. In reply the prosecutor argued that the testimony did not involve an inculpatory statement, because it did not refer to an offense already committed, but did involve a statement against interestan exception to the hearsay rule.
The trial judge ruled that the question did not seek, and the answer was not, an inculpatory statement, and as a statement against interest the response was an exception to the hearsay rule. Defense counsel assigns the ruling as error.
Questioning by the prosecutor then continued, at which time the witness testified that Cynthia had said she would prefer to see her husband dead than to divorce him because she wanted the house and the children.
The statements were admissible as proof of motive. State v. Sutfield, 354 So.2d 1334 (La.1978). Section 446 of Title 15 of the Revised Statutes provides that "When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent . . . ." (emphasis added). Thus testimony indicating that the accused had threatened the victim prior to the offense has been approved in State v. Leming, 217 La. 257, 46 So.2d 262 (1950). There the Court said: "[t]he purpose of [this kind of] evidence [is] to show motive for the killing on the part of the defendant and the evidence of prior acts, declarations, and threats of the accused, though no part of the res gestae, is admissible when it substantially tends to establish motive or intention of the accused to commit the crime." Similarly, testimony as to marital disaffection has been rationalized as evidence of motive. State v. Flood, 301 So.2d 637 (La.1974).
Assignment 8: Melba Whittennauer was also asked by the prosecutor if her former husband, Stacks, had ever threatened her about testifying in the case. She *807 answered that he had threatened her in a letter about a month before the trial. When asked what he said in the letter defense counsel objected on the grounds of hearsay, the objection was overruled, and the witness answered that Stacks wrote that he would "go to the government," and that if it was the last thing he would see, he would see her in Angola. He closed the letter with, "See you in Angola. Jim."
At the time of the threats Stacks was a codefendant, for he had not yet been severed. Evidence of such a threat by a person who has a direct connection with the defendant, as Stacks had with Cynthia Moses his one-time codefendant, was admissible. State v. Sawyer, 350 So.2d 611 (La.1977). In addition, the threats were relevant as rebuttal evidence to Stacks' recantation of his statement outlining the facts and circumstances surrounding the murder of James Moses. See State v. Hillman, 298 So.2d 746 (La.1974). This assignment of error is therefore without merit.
For the reasons assigned, the conviction and sentence are affirmed.
DIXON and DENNIS, JJ., concur.
TATE, J., concurs and assigns written reasons.
BLANCHE, J., not participating.
TATE, Justice, concurring.
At the moment, the writer is not prepared to find that the errors to be noted were so prejudicial as to require reversal.
Nevertheless, Assignments 4, 5, and 6 represent clearly improper attempts by the state to bolster the credibility of the witness Stacks' prior statement, which (inconsistent with his testimony at the trial), implicated the defendant in the crime. In connection with proof of this prior out-of-court statement, the police officer Drennan was on three occasions permitted, over defense objection, to reply to prosecution questions as to whether the defendant was sincere in his earlier statement (the deputy replied that he was) and to whether the statement "sound[ed] to you like a statement which was being made up?" (the officer replied it did not), etc.
The majority opinion holds that the police officer was qualified by his police experience to draw these conclusions.
This is an erroneous statement of legal principle. A witness can testify only to facts within his knowledge, but he cannot testify (based solely on his impression) to his evaluation of the subjective motive or credibility of another witness who performed an act or made a statement. See, e. g., State v. George, 346 So.2d 694, 702 (La.1977) and decisions there cited.
The witness (Drennan) is competent to testify that the earlier witness (Stacks) had made an earlier statement inconsistent with his trial testimony; but it is for the jury, not for the witness Drennan, to determine whether Stacks' court testimony is untruthful.
In the present instance, the earlier witness (Stacks) had admitted making the prior inconsistent testimony. Therefore, the state could not thereafter introduce in full his prior inconsistent statement. The only legal purpose for allowing introduction of the fact of the prior inconsistent statement is to show the present statement is false (and not to prove the substantive contents of the prior statement); therefore, the introduction into evidence of the prior statement, after the witness distinctly admits making it, may be reversible. See La.R.S. 15:493; State v. Mosely, 360 So.2d 844 (La.1978). See also State v. Williams, 331 So.2d 467 (La.1976).
On cross-examination Stacks distinctly admitted each detail of the prior statement. Consequently, the subsequent introduction, through the police witness, of the entire statement again for a second time was improper under the statute and jurisprudence.
The defendant did not, however, object to this introduction for a second time of the prior out-of-court statement by Stacks. Her objection was made only in the cross-examination of Stacks and contested, rather, the use of any impeachment at all by the state of its own witness.
*808 Once we concede (as I do) that the state was entitled to attack the testimony of Stacks, although its own witness, on the grounds of surprise or hostility, then reversible error was not committed by the re-introduction of the prior statement due to the failure of the defendant to object.
However, Assignments 4, 5, and 6, arising during the re-introduction testimony of the police witness, concern the state's rather blatant efforts above-noted to bolster the credibility of Stacks' out of court statement by having the police witness evaluate them as truthful. They do present a substantial issue of reversible prejudice, as noted above.
However, at present I am unwilling to say that the three improper questions allowed are themselves so prejudicial as to require reversal, when indeed the real prejudice resulted from the unobjected-to re-introduction in full (but without objection) of the entire contents of the prior out-of-court statement in apparent proof of the truth of their contentswhereas the law contemplates that the fact of these prior out-of-court statements (inconsistent with the trial testimony) is admissible for the restricted purpose only indicating that Stacks' trial testimony is false.
Therefore, although with reservations, I concur.
NOTES
[*] Dixon, J., would grant a rehearing.