575 So.2d 478 (1991)
STATE of Louisiana, Plaintiff-Appellee,
v.
Gregory SAVAGE, Defendant-Appellant.
No. CR90-465.
Court of Appeal of Louisiana, Third Circuit.
February 6, 1991.
*481 Robert C. Johnson, James Ross, Monroe, for defendant-appellant.
John F. Johnson, Dist. Atty., Harrisonburg, for plaintiff-appellee.
Before FORET, KNOLL and KING, JJ.
KNOLL, Judge.
Defendant, Gregory Savage, was indicted by a grand jury with second-degree murder, a violation of LSA-R.S. 14:30.1. After a jury trial, a twelve person jury unanimously found defendant guilty as charged. Subsequent to the denial of defendant's various post-trial motions and his waiver of sentencing delays, the sentencing court ordered defendant punished by life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. Defendant appeals his conviction, relying on thirteen assignments of error.

FACTS
On the morning of June 2, 1987, Pearl Smith went to the home of her aunt, Daisy Parker Smith, who had returned the day before from a three week trip to New Orleans. After entering the home with a key entrusted to her, Pearl Smith found her aunt, a woman seventy-nine years of age, dead in her bed. Mrs. Smith immediately telephoned the police to notify them of her aunt's death.
Pete Tolar, a deputy with the Catahoula Parish Sheriff's Office, testified that when he arrived at the victim's home, he found dirt on the floor of the bedroom, bathroom, living room, dining room, and kitchen. He also stated that a flower arrangement had also been knocked off the victim's night stand in her bedroom. Mrs. Smith stated that her aunt always kept a clean house, and that she was surprised to find vases knocked over in the house.
Although Dr. William C. Coney, the Catahoula Parish Coroner, did not initially suspect foul play, he requested an autopsy. The autopsy performed by Dr. V.E. Pierce, a pathologist at Rapides General Hospital, revealed bruising on the victim's neck and a rupture of the blood vessels in the victim's eyes, both characteristic of strangulation. Because of the pathologist's conclusion that the victim's death could not have been accidental, the police initiated an intensive investigation into the victim's death.
A thorough examination of the crime scene uncovered blood stains on the victim's *482 pillowcase, her nightgown, and on the bed sheets and an apron, as well as semen stains on the victim's bed sheets. Sophisticated blood typing techniques later showed that defendant was within the 9% category of the black population who could have matched the semen stains found in the victim's home. The crime scene technicians also looked throughout the victim's house for money. Despite a detailed search of the house, the police were unable to find any money, even though one of the victim's nieces stated that the victim left New Orleans with over $100 in her purse.
From the outset, the police initiated an intensive neighborhood investigation, and interviewed the residents of the neighborhood, searching for clues. As part of that inquiry, Deputy Tolar interviewed defendant on June 3, 1987. Defendant, who lived near the victim, stated that he had mowed the victim's lawn several times, and that he had last seen the victim one or two months prior to her death. Defendant also stated that on June 1 Shirley Hatten, a friend, dropped him off in the vicinity of the victim's house at approximately 9:45 p.m. so that he could make a telephone call. Police found no one in the neighborhood who allowed defendant to use their telephone on the night of June 1. Shirley Hatten corroborated defendant's statement that she gave defendant a ride, but she said that it was around 11 p.m. when she dropped him off near the victim's home; she did not see where defendant went after she dropped him off. In defendant's interviews with the police on June 3 and 19, 1987, he maintained that he had never been inside the victim's home. Defendant's girl friend, Shelly Cummings, told police that defendant needed money.
In a matter independent from this investigation, Mr. Joel R. Ramsey, a man for whom defendant did yard work, asked the police on June 8, 1987, about initiating criminal charges for unauthorized use of his telephone. Mr. Ramsey testified that there were several long distance telephone calls on his telephone bill that were made to Las Vegas prior to the victim's murder. Ramsey testified that defendant stated that he placed the calls and would pay him back. Ramsey did not bring criminal charges against defendant.
With the independent information provided by Mr. Ramsey, the police checked the victim's telephone billing to see if any long distance calls were made to Las Vegas on the night of June 1, 1987. Telephone records revealed that such a call had been placed on the victim's telephone at 11:05 p.m. (CDT) to the same telephone number which appeared on Ramsey's customer billing.
At the request of the Catahoula Sheriff's Office, the Las Vegas Metropolitan Police Department was asked to interview Julius Savage, the telephone customer to whom the call was placed from the victim's residence. Pursuant to that request, Detective Joseph B. McGuzkin and Sergeant Rosin contacted Julius Savage at his residence on June 19, 1987. Julius Savage told the Las Vegas police that he was defendant's uncle. Detective McGuzkin testified that Mr. Savage related general information about two telephone calls he received earlier in May from defendant, and gave more specifics about the telephone call he received from defendant on or about June 1 between 9 and 10 p.m. (PDT).
With this additional information, the Catahoula Parish Sheriff's Office arrested defendant pursuant to an arrest warrant on June 19, 1987, and he was incarcerated for the murder of Daisy Smith. Subsequently, the grand jury indicted defendant for the first-degree murder of the victim.
After defendant was jailed for the victim's murder, a prisoner witnessed an argument between defendant and another prisoner. During that argument, defendant made the statement, "I done killed one bitch, so killing another one won't matter." On another occasion at the jail, two jailers overheard a loud and animated conversation between defendant and his mother, wherein the defendant told his mother that he was guilty and that he was going to kill himself because his friends were mad at him.
On January 24, 1989, the grand jury recalled its prior indictment, and re-indicted *483 defendant for the second-degree murder of the victim.

MOTION TO RECUSE TRIAL JUDGE
Defendant contends that the trial court erred in refusing to grant a motion for recusal, and in refusing to allow the trial judge to be called as a witness during the trial.
These two assignments of error have already been brought before this court by writ of certiorari in State v. Savage, No. K89-783 (La.App. 3rd Cir.1989). This court denied the writ, finding that there was no error in the trial court's ruling in denying both motions. Since these issues have already been decided, there is no need to address them again. See State v. Roberts, 550 So.2d 1254 (La.App. 4th Cir.1989), writ denied, 558 So.2d 599 (La.1990).

CHANGE OF VENUE
Defendant contends that the trial court erred in denying his motion for a change of venue. He argues that he could not receive a fair and impartial trial because of the nature and extent of pre-trial publicity in the case.
LSA-C.Cr.P. Art. 622 provides:
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
In State v. Kahey, 436 So.2d 475, 481 (La.1983), the Louisiana Supreme Court stated:
"The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors. Qualified jurors need not, however, be totally ignorant of the facts and issues involved. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.
At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights. If the defendant can demonstrate the actual existence of a fixed opinion as to the defendant's guilt, the individual juror may be excluded by a challenge for cause. If the defendant can demonstrate that actual prejudice, influence, or other reasons exist which will affect the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial, the court must take this into consideration in deciding whether to grant a change of venue.
Moreover, although extensive knowledge in the community of either the crimes or the putative criminal and his prior crimes is not in itself sufficient to render a trial constitutionally unfair, unfairness of a constitutional magnitude may be presumed so as to require a change of venue if the `trial atmosphere' has been `utterly corrupted by press coverage.'" (Citations omitted.)
Relevant factors in considering whether to change venue are: (1) the nature of the pre-trial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and, (7) any factors likely to affect the candor and veracity of the prospective jurors. State v. Bell, 315 So.2d 307 (La.1975), appeal *484 after remand, 346 So.2d 1090 (La. 1977).
In the present case, the trial court deferred ruling on the motion for a change of venue until the court, State and defense counsel attempted to pick the jury. Postponing final action on a motion for change of venue until completion of voir dire is proper. State v. Brogdon, 426 So.2d 158 (La.1983), appeal after remand, 457 So.2d 616 (La. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985), reh'g denied, 473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985). The burden of proof is on the defendant to show that such prejudice exists in the community that a fair trial is impossible. State v. Neslo, 433 So.2d 73 (La.1983). Whether defendant has made the requisite showing for a change of venue is a question addressed to the trial court's sound discretion. State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982).
In the case sub judice, the Catahoula News Booster and Alexandria Daily Town Talk published nine articles in 1987 and 1988, more than one year prior to the date of defendant's trial, reporting Daisy Smith's murder, defendant's arrest and indictment, as well as the arrests of defendant's mother and brother on charges of attempted conspiracy to obstruct justice in Daisy Smith's murder investigation. The articles were brief, factual, and objective.
The record shows that the trial judge, district attorney, and defense counsel conducted a through voir dire of the prospective jurors. Each prospective juror was asked about his knowledge of the case from newspaper accounts or radio broadcasts. The trial judge asked the jurors asked the if they could put aside what they previously heard or saw, and whether they could decide the defendant's innocence or guilt based solely on the evidence the State would present. The trial judge excused for cause all prospective jurors who stated that they could not make an unbiased judgment.
After carefully examining the record, we do not find that the defendant carried his burden of proving that he was entitled to a change of venue. An examination of the transcription of voir dire indicates, at best, that some of the prospective jurors merely knew of the alleged facts of the case, an insufficient basis for a change of venue. State v. Kahey, supra. Accordingly, we find that the trial court did not abuse its sound discretion in denying defendant's motion for a change of venue.
In an ancillary argument, defendant contends that the trial court erred in denying his request that the examination of the jurors be conducted individually, rather than collectively, with the jury pool sequestered from the courtroom to prevent the prospective jurors from hearing the questions being asked individual jurors. There is no provision in our law which either prohibits or requires the sequestration of prospective jurors for an individual voir dire. State v. McGraw, 564 So.2d 727 (La. App. 2nd Cir.1990). A trial judge has the discretion to permit individual voir dire if a defendant can demonstrate that special circumstances are present. Id.
Defendant's sole assertion in his motion is that a collective voir dire would educate all jurors to prejudicial and incompetent material due to the articles published in the local newspapers. After carefully reviewing defendant's motion and the evidence adduced at trial, we find that defendant has not shown special circumstances which would have justified individual voir dire, and the sequestration of the prospective jurors during voir dire. In questioning the prospective jurors about their knowledge of the case sub judice, the trial judge took great care to structure his questioning so that the jurors were not exposed to the contents of the news articles. On the basis of the prospective jurors' responses, the trial court was able to exclude those who might have been prejudiced.
This assignment of error is without merit.

MOTION TO QUASH THE JURY VENIRE
Defendant contends that the trial court erred in refusing to grant his motion to *485 quash the petit jury venire. Defendant argues that the venire was drawn solely from a list of registered voters, and thus was not representative of the community as a whole. In particular, defendant asserts that many persons in Catahoula Parish may not be registered voters or possess a valid Louisiana driver's license, a supplemental method of juror selection in the parish, but would meet the general qualification of a juror.
LSA-C.Cr.P. Art. 419 provides, in pertinent part:
"A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race."
Louisiana jurisprudence allocates to the defendant the burden of establishing fraud or that some irreparable injury was caused by the jurors' selection process. State v. Larue, 324 So.2d 384 (La. 1975).
Defendant does not direct our attention to any law or jurisprudence on this issue. Instead, he relies on general assertions that the selection process employed in the present case deprived him of his right to a jury which was representative of a fair cross-section of the community.
The jurisprudence has recognized that the use of voter registration lists as the sole source from which a venire is compiled is a constitutionally sound practice, unless a defendant can show that such a practice discriminates against a certain class of persons to the extent that the venire does not represent a fair cross-section of the community. State v. Brogdon, supra. Likewise, in State v. Sheppard, 350 So.2d 615 (La.1977), the Supreme Court upheld a general venire composed of a list of registered voters and persons with driver's licenses residing in the parish, where there was no showing that such a selection process was discriminatory.
In the present case, the Clerk of Court for Catahoula Parish testified that the names on the venire list are primarily chosen from voter registration rolls and a driver's license list. In addition, the names of five or six persons who are not registered to vote and do not have driver's licenses are added to the computer list. The names are then selected from the computer at random.
After carefully examining the record before us, we find no evidence submitted by the defendant that the jury venire selection process was conducted fraudulently or that it caused the defendant any irreparable injury.
This assignment of error is without merit.

CONTINUANCE
Defendant contends that the trial court erred in refusing to grant his motion for a continuance. Defendant argues that he was entitled to a continuance because of the State's failure to supplement discovery responses.
On July 6, 1987, shortly after defendant's arrest and arraignment, defendant filed a motion for discovery and inspection. Several months later, the State filed written responses. Subsequent thereto, the State supplied defendant with a statement allegedly made by defendant to his mother during a jail visitation which was overheard by two deputies. Defendant's motion to suppress this statement was heard and denied.
On August 15, 1989, defense counsel sent the State a certified letter requesting that the pretrial discovery motions be supplemented, if necessary. On August 19, two days prior to the scheduled commencement of trial, defense counsel telephoned the State to determine if it would be supplementing the discovery response. During this conversation, the State revealed to defense counsel that it possessed a statement or admission made by the defendant on April 28, 1988, to another inmate, Robert Charrier, during an argument. In essence, defendant is alleged to have stated to Charrier that defendant had killed one *486 bitch and would not hesitate to kill another one.
On August 21, 1989, defendant filed a motion for a continuance because of the State's untimely compliance with the discovery notice. After disposing of several other pretrial motions, the trial court granted a two day recess in an attempt to cure the problem presented by defendant's motion. In granting this recess, the trial court allowed defendant to reurge his motion when trial commenced after the recess.
When the trial reconvened, defendant reurged his motion for a continuance. The trial court denied defendant's motion, and defense counsel noted his objection.
LSA-C.Cr.P. Art. 729.5 provides:
"A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
B. In addition to the sanctions authorized in Part A hereof, if at any time prior or subsequent to final disposition the court finds that either the state through the district attorney or assistant district attorney or the defendant or his counsel has willfully failed to comply with this Chapter or with an order issued pursuant to this Chapter, such failure shall be deemed to be a constructive contempt of court."
Generally, the denial of a continuance is not grounds for the reversal of a conviction absent an abuse of discretion and a showing of specific prejudice caused by the denial of the continuance. State v. Jones, 395 So.2d 751 (La.1981). Where the motion for continuance is based upon the insufficiency of time for preparation by counsel, this specific prejudice requirement has been disregarded only in cases where the preparation time was so minimal as to cast doubt on the basic fairness of the proceedings. State v. Dupre, 408 So.2d 1229 (La.1982).
At the initial hearing on defendant's motion, the district attorney testified that he thought his office had notified defendant of the statement at an earlier date. The assistant district attorney testified that the district attorney had inquired about whether defendant had been notified of the statement, and was advised that the notice of the statement had been sent in January 1989. The district attorney's secretary also corroborated this testimony, stating that she mailed the statement to defense counsel around the first of January 1989. Nevertheless, the State was not able to locate a copy of this letter containing the statement.
The trial court stated that it could not assume that the notice defendant received was unreasonable. Instead it focused on the question of whether the notice was timely in light of the type of investigation defendant would need to prepare a defense against the statement. At the hearing on the defendant's original motion for a continuance, the State offered to furnish information to defendant about its intended use of witnesses regarding the statement so as to aid in the preparation of his defense. Likewise, the trial court specifically determined that in light of the facts presented, it did not find that the State willfully withheld this information from the defendant.
After carefully reviewing the record, we find no error in the trial court's refusal to grant an additional continuance. At trial it was revealed that defense counsel interviewed Joseph Adams, the State's primary witness regarding this statement, for one and one-half hours. Moreover, in the presentation of defense evidence, defendant called Robert Charrier, the purported recipient of defendant's statement, as his witness to testify concerning the statement at issue. Charrier denied that defendant ever made an inculpatory statement to him. Thus, the jury was presented with diametrically opposing versions, and, as fact finder, was called upon to resolve the inconsistencies. In light of the record before us, we *487 find that there has been no showing of specific prejudice caused by the trial court's denial of an additional continuance.
This assignment of error is without merit.

SEQUESTRATION OF POTENTIAL WITNESS
Defendant contends that the trial court erred in its denial of defendant's request to sequester Sheriff Jackson of Catahoula Parish. He argues that a request for sequestration is mandatory under LSA-C.E. Art. 615, and that he was not required to state his reasons to the court for seeking such action.
During voir dire, defendant asked the trial court to place Sheriff Jackson under the rule of sequestration because he intended to call him as a witness. The trial court stated that the Sheriff was an officer of the court, and that since the parish was small, he was needed in the courtroom to supervise the court's security. On this basis, the trial court stated that it would deny the defense motion unless it could specify the reason why sequestration was required. After conferring with counsel at the bench, the trial court denied defendant's motion, stating that the Sheriff, by admission of the State, had not taken an active part in the investigation of this murder, and defendant had not presented reasons which would require sequestration.
The purpose of sequestration is to prevent witnesses from being influenced by prior testimony, and to strengthen the role of cross-examination in developing facts. State v. Thomas, 470 So.2d 413 (La.App. 3rd Cir. 1985).
In the present case, Sheriff Jackson was not called as a witness. Therefore, at that point, defendant's objection obviously became moot. See State v. Penny, 486 So.2d 879 (La.App. 1st Cir.1986), writ denied, 489 So.2d 245 (La. 1986).
This assignment of error is without merit.

MISTRIAL
Defendant contends that the trial court erred in denying his request for a mistrial based on an allegation that the trial court improperly commented upon or repeated the trial testimony of Shelly Cummings in the presence of the jury.
Mistrial is a drastic remedy and, except in instances in which mistrial is mandatory, is warranted only when trial error results in substantial prejudice to the defendant sufficient to deprive him of a fair trial. State v. Heads, 370 So.2d 564 (La. 1979), vacated and remanded, 444 U.S. 1008, 100 S.Ct. 654, 62 L.Ed.2d 637 (1980), on remand, 385 So.2d 230 (La.1980).
During the presentation of its case-in-chief, the State called Shelly Cummings, defendant's girl friend, to testify. When the State questioned Cummings about defendant's need for money to pay a fine, defense counsel objected, contending that the State was attempting to establish that defendant had committed another crime. During arguments on defendant's objection, the jury was removed from the courtroom.
After the trial court overruled defendant's objection, the following dialogue between the trial judge and the witness occurred when the jury was returned to the courtroom:
"Court: The question is not objective [sic] to this point. Let's get the jury back and the witness back.
(JURY AND WITNESS RETURNED)
Ms. Cummings, before the recess, I believe the District Attorney had asked you whether or not you knew whether Ms. [sic] Savage had money and you answered yes, and that you were holding $80.00 that belonged to him. Is that correct?
A. Yes.
Court: And the District Attorney asked you if you knew whether you [sic] owed money or not and I believed you answered yes to that. Now, he asked you also, whether you knew whether or not the amount he owed was over $80.00. That's the point we stopped, I believed.

*488 Defense: Your Honor, I object to that series of questioning. I think that that's improper (inaudible) Court (inaudible) and I am going to move for a Mistrial.
Court: Alright. Your motion is denied. I haven't commented on the evidence."
Defendant, relying on LSA-C.Cr.P. Art. 772, argues that the trial court improperly asked questions of the witness, since her previous testimony was neither confusing nor evasive.
LSA-C.Cr.P. Art. 772 provides:
"The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted."
After carefully reviewing the record in light of the background for the trial court's action, we find that the trial judge neither commented on the evidence nor voiced an opinion about what had been proved or not proved. Rather, it is clear that in context of the recess just granted, the trial judge was merely attempting to help resume the witness' testimony at the time of the interruption so that the jury could better follow the presentation of evidence. LSA-C.Cr.P. Art. 772 does not restrain the trial court from clarifying testimony when necessary or desirable. State v. Roberson, 445 So.2d 12 (La.App. 4th Cir. 1983), writ denied, 449 So.2d 1344 (La.1984). Moreover, there is no hint in the trial court's dialogue that it abandoned its neutral and detached role, or that it injected any opinion before the jury.
On appeal defendant further contends that the trial judge's actions were incorrect because of LSA-C.Cr.P. Art. 793 and LSA-C.E. Art. 614. Neither of these arguments were raised as part of defendant's objection in the trial court. It is well established that a new basis for an objection may not be raised upon appeal. State v. Feeback, 414 So.2d 1229 (La.1982). These issues, being raised for the first time upon appeal, are therefore not properly before us.
This assignment of error is without merit.

HEARSAY: BUSINESS RECORDS EXCEPTION
Defendant contends that the trial court erred in admitting into evidence the telephone billings of Joel R. Ramsey, defendant's part-time employer, and Daisy Smith, the victim. Defendant argues that the telephone bills were hearsay, and that an improper foundation was laid for their admission into evidence.
In State v. Armstead, 432 So.2d 837, 840 (La.1983), the Louisiana Supreme Court stated:
"The printout of the results of the computer's internal operations is not hearsay evidence. It does not represent the output of statements placed into the computer by out of court declarants. Nor can we say that this printout itself is a `statement' constituting hearsay evidence. The underlying rationale of the hearsay rule is that such statements are made without an oath and their truth cannot be tested by cross-examination. Of concern is the possibility that a witness may consciously or unconsciously misrepresent what the declarant told him or that the declarant may consciously or unconsciously misrepresent a fact or occurrence. With a machine, however, there is no possibility of a conscious misrepresentation, and the possibility of inaccurate or misleading data only materializes if the machine is not functioning properly. For this reason, apparently, most definitions of hearsay are limited to out of court statements by a person made out of court and thus not under oath, and not subject of cross-examination or confrontation.
We therefore view the computer generated data in this case [i.e., computerized telephone traces] as demonstrative evidence of a scientific test or experiment." (Citations and footnotes omitted.)
In the present case, Kelly Adams, the security manager for South Central Bell, testified that one of his duties is to check unauthorized telephone calls and develop *489 telephone logs for police investigations. He stated that people do not necessarily input the data which is reflected on a customer's monthly bills. Most of the information appears automatically when the customer dials a number. When the number is dialed, it is either put on disk drive or a computer tape, which is processed in a data processing center, and then it appears on the customer's bill. Accordingly, the information never goes physically through a person's hands. Applying this evidence to the standard enunciated in State v. Armstead, supra, we find that the telephone bills were not hearsay evidence.
Nevertheless, defendant's primary contention, one not reached in State v. Armstead, supra, is that the State failed to lay the proper foundation to show the accuracy and reliability of the computer generated information.
From the outset, we note that the trial court has great discretion in determining the sufficiency of the foundation which is necessary for the introduction of evidence. State v. Jones, 544 So.2d 1209 (La. App. 3rd Cir.1989).
The State asked Adams to examine a standard telephone bill. After identifying the customer on this particular bill as being the victim, Adams testified that by following a standard computer process utilized by South Central Bell, he determined that a telephone call originating from the victim's telephone was placed at 11 p.m. on June 1, 1987, to Las Vegas, Nevada. Furthermore, Adams testified that telephone bills are made and kept in the course of regularly conducted business activity, and it is the telephone company's regular practice to keep and maintain these records.
In State v. Corey, 339 So.2d 804 (La. 1976), the defendant objected to the introduction of telephone slips from the Quality Inn and Holiday Inn showing telephone calls made by the defendant on certain dates in question. At trial no employee of either motel testified concerning the telephone slips. Instead a police officer retrieved the telephone slips from the motel on the day of trial and brought them to court himself. In upholding their admission into evidence, the Louisiana Supreme Court stated, "This court felt that the documents were business documents kept in the usual course of business, [and] that they were properly identified by the retrieving officer....". Id. at 808.
After examining the record before us, we cannot say that the trial court abused its discretion in finding that the State laid a proper foundation for the introduction of the telephone bills. In the case sub judice, Adams was qualified to explain the telephone company's billing procedure, and that these records were prepared and kept in the course of regularly conducted business activities. Id. Our conclusion is further buttressed by the fact that we are dealing with well accepted telephone billing procedures in the present case, rather than the informal use of telephone slips utilized in State v. Corey, supra.
This assignment of error is without merit.

MOTION TO SUPPRESS: DEFENDANT'S ARREST WARRANT
Defendant contends that the trial court erred in denying his motions to suppress his arrest and all statements made by him subsequent to his arrest. Defendant argues that the evidence which Deputy Paul Blunschi presented was insufficient to establish probable cause for his arrest pursuant to an arrest warrant.
Probable cause to arrest exists when the facts and circumstances within an officer's knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the accused has committed an offense. State v. Elliot, 407 So.2d 659 (La. 1981). Although mere suspicion is insufficient to justify an arrest, a police officer need not have sufficient proof to convict in order to arrest. State v. Brown, 507 So.2d 304 (La.App. 3rd Cir. 1987). The circumstances must show that criminal activity is more probable than noncriminal activity. Equivocal conduct does not afford probable cause for arrest, where the possibility of criminal conduct is no *490 greater than the possibility of innocent behavior. State v. Jordan, 506 So.2d 230 (La.App. 4th Cir. 1987).
LSA-C.Cr.P. Art. 202 states, in pertinent part:
"A warrant of arrest may be issued by any magistrate, and, except where a summons is issued under Article 209, shall be issued when:
(1) The person making the complaint executes an affidavit specifying, to his best knowledge and belief, the nature, date, and place of the offense, and the name and surname of the offender if known, and of the person injured if there be any; and
(2) The magistrate has probable cause to believe that an offense was committed and that the person against whom the complaint was made committed it."
The magistrate who issues the warrant must be supplied with facts and circumstances which would reflect probable cause for the issuance of the arrest warrant. LSA-C.Cr.P. Art. 202 does not require that such be incorporated into the affidavit, but that it may be supplied verbally to the magistrate. If such information reflects the necessary probable cause, the magistrate is authorized to issue the arrest warrant. State v. Haynie, 395 So.2d 669 (La. 1981).
In the present case, Deputy Paul Blunschi testified at the hearing on defendant's motion to suppress. Blunschi discussed all the evidence he compiled and presented to the magistrate. He stated that he interviewed Shirley Hatten, who drove defendant to the corner of the victim's street on the night of June 1 and dropped him off because he stated that he needed to place a telephone call. Several other witnesses also informed the police that defendant had a scratch on his chest which appeared around June 1. Later, Blunschi learned from the telephone company that a telephone call was placed at 11:05 p.m. (CDT) on the night of the homicide from the victim's residence to Las Vegas, Nevada. Pursuant to this lead, the Catahoula Parish Sheriff's Office requested the Las Vegas police to interview the person to whom the telephone call was made. Accordingly, the Las Vegas authorities interviewed Julius Savage, defendant's uncle. According to the Las Vegas police, Julius Savage stated that defendant called him three times asking for money, the third telephone call coming during the evening on or about June 1; at that time, Julius Savage told defendant that he could not give him the money.
On cross-examination, Blunschi stated that he talked to one of the victim's nieces who stated that the victim had $100 in her purse when she returned from New Orleans on May 30, 1987.
Mr. Ramsey, defendant's part-time employer, stated during an interview with police authorities that several telephone calls to Las Vegas had been charged on his phone bill. Ramsey stated that when he confronted defendant about the charges, defendant admitted that he made the calls and that he would pay him.
Blunschi also stated that defendant paid part of a fine, about $50, on June 4. At the suppression hearing, Blunschi candidly admitted that he was not certain if the magistrate was aware that defendant had a part-time job from which he may have earned money.
Blunschi further testified that he interviewed everyone in the victim's neighborhood who had a telephone to see if defendant had used their telephone on the night of the homicide. No one in the victim's neighborhood had allowed defendant to use their telephone. Blunschi also stated that he thought that he told the magistrate that no fingerprints were found at the victim's residence that matched defendant's. Likewise, when Blunschi sought the arrest warrant, crime lab results had disclosed semen stains on the victim's bed, but no scientific breakdown of the blood typing had been done at that point which would have further focused on defendant.
According to Blunschi, he based his showing of probable cause on the three conversations he held with the magistrate prior to the issuance of the arrest warrant.
*491 At the suppression hearing, Judge Falkenheiner, the magistrate, testified that he had several conversations with the law enforcement officers involved in this investigation prior to the issuance of the arrest warrant, and that he told Deputy Blunschi that he did not think there was probable cause to issue the arrest warrant until he heard the evidence of the telephone bill showing the call from the victim's residence to Las Vegas. Judge Falkenheiner stated that this new evidence, when combined with all of the other information he had received, provided the probable cause he needed for the issuance of the arrest warrant.
Based on the entirety of the evidence presented, we do not find that the trial court erred in denying defendant's motion to suppress the arrest warrant, and the statements made by him subsequent to his arrest. It is clear that all of the testimony presented to the magistrate provided sufficient probable cause for the issuance of the arrest warrant.
This assignment of error is without merit.

MOTION TO SUPPRESS: ORAL STATEMENTS OVERHEARD
Defendant next argues that the trial court erred in denying his motion to suppress statements defendant allegedly made to his mother during a visit to the jail which were overheard by Deputies Wedon McMillin and Gary Wright on July 26, 1987. Defendant argues that these officers clearly violated his right to privacy while he was in the jail.
Gary Wright testified that he was working as a radio operator in the jail on July 26, 1987, when defendant's mother visited defendant in jail. The conversation took place in the visitation room which is located just outside the radio room. The door to the visitation room was closed. On July 26, Wright testified that he overheard a rather loud conversation between defendant and his mother.
Wedon McMillin, a jailer with the Catahoula Parish Sheriff's Department, was working with Wright on July 26, 1987. During the visitation between defendant and his mother, McMillin was in the radio room. McMillin testified that he was close to the door of the radio room because he heard loud talking between defendant and defendant's mother coming from the visitation room.
The trial court overruled defendant's motion to suppress, stating that the two witnesses were only able to overhear the conversation because defendant and his mother were speaking in excited and very loud voices. On this basis, it concluded that there was no violation of any right to privacy.
In analyzing the issue presented herein, we find that State v. Moses, 367 So.2d 800 (La.1979) is dispositive. In State v. Moses, supra, five officers of the sheriff's office followed defendant and a friend to a motel, borrowed a key from the motel manager, and entered a room adjacent to defendant's. From this room, the officers overheard the conversation between defendant and her friend. The officers did not use an electronic listening devices. Two of the officers even put their ears to the wall to listen. Justice Summers, writing for the court, distinguished Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), finding that since no electronic device was used to overhear the conversation, no intrusion or entry was made into the room occupied by defendant. Quoting from Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Louisiana Supreme Court stated:
"`The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.'"
The Louisiana Supreme Court determined that defendant's right to privacy was not violated. State v. Moses, supra, at page 804.
In the case sub judice, the deputies used no electronic listening devices, and were able to hear defendant and his mother *492 speaking only because their voices were raised. On this basis, we find that defendant's constitutionally recognized right to privacy was not violated.
This assignment of error is without merit.

MISTRIAL: STATE'S IMPROPER REBUTTAL
Defendant contends that the trial court erred in refusing to grant a mistrial after the State elicited improper rebuttal evidence.
In particular, defendant points out that the State asked Gary Wright in its case-in-chief if defendant had been charged with any other crimes at the time of defendant's conversation with his mother in the jail's visitation room. In addition, the State asked Wright what defendant's mother's response was when defendant told her that he was guilty. Defendant argues that when the State called Deputy Pete Tolar as a rebuttal witness after the defense called two witnesses, he was asked the same question that it propounded to Gary Wright in the presentation of its case-in-chief.
Defendant's contention, based on State v. Davis, 246 La. 383, 164 So.2d 589 (1964), is that the State's rebuttal testimony was repetitive and constituted a repetition of negative testimony.
Generally, it is too late to complain of an irregularity in the trial proceedings when the objection was not made at a time during trial when relief might have been granted. State v. Bird, 302 So.2d 589 (La. 1974).
In the case sub judice, defendant's objection to Tolar's testimony came only after the State completed its entire examination of this witness. Certainly, at that point defendant's objection was not made at a time when the trial court could have granted relief. See State v. Davis, supra; State v. Gultry, 471 So.2d 804 (La.App. 5th Cir. 1985). For this reason, we find that defendant's assignment of error is not properly before us.
Nevertheless, out of an abundance of caution, we have considered this alleged error and find no error in the trial court's denial of defendant's motion for a mistrial. As pointed out earlier herein, mistrial is a drastic remedy and, except in instances in which mistrial is mandatory, it is warranted only when trial error results in substantial prejudice to the defendant sufficient to deprive him of a fair trial. State v. Heads, supra.
In the present case, the State simply asked the witness if he was aware of defendant's statement, and did not ask any questions concerning the content of the statement. Furthermore, the other question posed to Deputy Tolar elicited a response from the witness that the only charge against defendant at the time of his statement was the murder charge for which defendant was currently being tried. Since both the witness in the State's case in chief and the witness on rebuttal testified that no other charges were pending against defendant, this could not constitute prejudice to the defendant and did not deprive him of a fair trial.
This assignment of error is without merit.

DENIAL OF DEFENDANT'S MOTIONS FOR NEW TRIAL AND POST-VERDICT JUDGMENT OF ACQUITTAL
Finally, defendant contends that the trial court erred in denying his motions for new trial and for a post-verdict judgment of acquittal. Because of the common issues presented, we will treat these arguments together.
Defendant's motion for a new trial was based upon his assertion that the verdict was contrary to the law and the evidence produced at trial. LSA-C.Cr.P. Art. 851 reads in pertinent part:
"The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:

*493 (1) The verdict is contrary to the law and the evidence; ...."
In State v. Landry, 524 So.2d 1261 (La. App. 3rd Cir.1988), writ granted on other grounds and remanded, 531 So.2d 254 (La. 1988), appeal after remand, 546 So.2d 1231 (La.App. 3rd Cir.1989), we stated that it is necessary for the trial judge to review a motion for a new trial under both the thirteenth juror standard, in order to determine whether the defendant is entitled to a new trial, and the Jackson standard in order to determine whether the defendant is entitled to an acquittal based on the insufficiency of evidence.
Defendant's motion for post-verdict judgment of acquittal was based upon the same arguments asserted in his motion for a new trial. LSA-C.Cr.P. Art. 821 states in pertinent part:
"A. The defendant may move for a post verdict judgment of acquittal following the verdict. A motion for a post verdict judgment of acquittal must be made and disposed of before sentence.
B. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty."
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore the reviewing court should not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. Id.
For the State to obtain a conviction in the present case, it must prove the essential elements of second-degree murder beyond a reasonable doubt. LSA-R.S. 14:30.1 provides, in pertinent part:
"Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, ... aggravated burglary,... armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm."
LSA-R.S. 14:10 defines specific intent, as it affects paragraph (1) hereinabove, as follows, in pertinent part:
"(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."
Specific intent is a state of mind and need not be proven as fact, but rather it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982).
At trial, Pearl Smith, the victim's niece, testified that she found her aunt dead in bed on the morning of June 2, 1987. Mrs. Smith stated that although the victim always kept a clean house, she found vases had been knocked over when she entered her aunt's home on the morning of June 2. Deputy Pete Tolar testified that when he arrived at the victim's house on June 2, 1987, he found dirt on the floor of the bedroom, bathroom, living room, dining room, and kitchen. A flower arrangement had also been knocked off the victim's night stand in her bedroom.
Tolar interviewed defendant on June 3. In that interview, defendant stated that he had been dropped off near the victim's house around 9:45 p.m. on June 1 because he needed to make a telephone call. Defendant also stated that he mowed the victim's lawn several times and last saw her one or two months before her death.
Dr. Pierce, the pathologist, testified that he found bruising on the victim's neck and bleeding under the skin in the neck area, which are characteristics of strangulation. He also found a rupture of the blood vessels *494 in the eyes, which is also characteristic of strangulation. In addition, he found a small cut in the victim's chin consistent with a fingernail wound. Dr. Pierce stated that there was no chance that the victim's death could have been accidental.
Deputy Paul Blunschi stated that from his interviews with the residents of the neighborhood he learned that the victim was last seen alive at 10:00 p.m. on June 1. Although fingerprints were taken at the scene, none matched defendant's. Likewise, no identifiable fingerprints were taken from the victim's telephone. Furthermore, Deputy Blunschi testified that even though a thorough search of the victim's house was made, no money was found.
Lucy Gregiaus, the victim's niece, testified that she picked up the victim in the early part of May, and brought her to New Orleans for three weeks. Mrs. Gregiaus testified that her aunt had received a social security check in an amount of approximately $300 on May 3, and that her aunt paid some bills prior to leaving for New Orleans. Mrs. Gregiaus also stated that the victim did not spend much money while she was in New Orleans. The victim had told Mrs. Gregiaus that defendant had cut her grass before she left for New Orleans, but she had not paid him. When her aunt left New Orleans, she had $6 wrapped in a knotted handkerchief to pay defendant. She also stated that when her aunt left to return to Jonesville, her aunt had over $100, together with $25 cash and a $36 check she received for her birthday; the money was in a check envelope in her aunt's purse.
Wesley Bruce, a crime scene technician with the Vidalia Police Department, testified that when he examined the victim's residence on June 2, 1987, he found a metal bar in the trash can in the victim's bedroom. No latent prints were found and it appeared that there were smudge wipes on it. A piece of white cloth was found on the side of the victim's bed, which could have been used to wipe the prints.
Paul Scott, an investigator for the Catahoula Parish District Attorney's office, testified that he interviewed defendant twice. In the first interview, defendant stated that he had never been in the victim's house. At the second interview, defendant stated that he had called his uncle, Julius Savage, who lived in Reno, Nevada during April 1987, and asked him for a loan.
Pat Wojtkiewicz, a forensic chemist with the North Louisiana Crime Lab, testified about blood and semen stains found in the victim's house. Blood was found on the victim's pillowcases which could match the victim or the defendant. Wojtkiewicz performed several enzyme marker tests and found Type +1 which is consistent with defendant and the victim's blood types. He also found Peptidase A Type 1; almost 85% of blacks are Type 1s. Semen stains were also found on the top bed sheet. The semen was identified as having come from an individual who was either a non-secreter or an atypical secreter; defendant is a non-secreter. Human blood stains were also found on an apron and on two nightgowns. The blood on the apron was the same type as defendant's; the blood on the gowns could have come from the victim, the defendant, or another person with the same characteristics. Wojtkiewicz concluded that only 9% of the black population could have left the semen stains on the sheets, and defendant was within that 9%.
Shirley Hatten testified that she brought defendant home from a party around 11:00 p.m. on June 1. Defendant asked her to drop him off at the corner, not far from the victim's house, because he had to make a telephone call.
Julius Savage, defendant's uncle, was also called to testify, about defendant's telephone call to him in Las Vegas, Nevada on June 1, 1987. Las Vegas Police Detective Joseph McGuzkin testified that Julius Savage made a statement to the police on June 19, 1987, wherein he stated that he had received three telephone calls from defendant: on May 3, 1987; May 17, 1987; and June 1, 1987. The June 1 call was reveived between 9 and 10 p.m. Pacific time, i.e., between 11 and 12 p.m. (CDT). The victim's telephone bill was introduced into evidence, which revealed a call placed *495 to Julius Savage's residence in Las Vegas on June 1, 1987, at 11:05 p.m. (CDT).
Shelly Cummings, defendant's girl friend, testified that defendant possessed about $80 at the time of the victim's death. She knew the amount of money that defendant had because she was keeping it for him; she was also aware that defendant needed money.
Mr. Ramsey, defendant's part-time employer, testified that there were several telephone calls on his June 1987 telephone bill that were made to Las Vegas. When Ramsey confronted defendant about the calls, defendant stated that he had made the calls and would repay him. A comparison of telephone numbers called in Las Vegas from Ramsey's telephone and the victim's telephone shows that they are identical.
A prisoner in the Catahoula Parish jail, Joe Adams, testified that he observed an argument between defendant and Robert Charrier, another prisoner, on April 28, 1988. Adams gave a statement on May 10, 1988, to police, wherein he said that the defendant told Charrier, "I done killed one bitch, so killing another one won't matter."
Gary Wright, a Catahoula Parish deputy sheriff and a radio operator at the jail, testified that on July 26, 1987, he overheard defendant tell his mother in the visitation room that his friends were mad at him on the outside. He also told his mother that he was guilty and he was going to kill himself because his friends were mad at him. His mother told him he was not guilty, his friends were not mad at him, and he should not be saying things like that. Wedon McMillin, a Catahoula Parish jailer who was also present during defendant's mother's visit at the jail, corroborated Wright's testimony.
The defense witnesses, Robert Charrier and Vera Savage, defendant's mother, testified that they had never heard the incriminating statements allegedly made to them by defendant.
After viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found defendant guilty of second-degree murder beyond a reasonable doubt. Based on the pathologist's report, it is clear that the victim died of manual strangulation. Testimony of Pat Wojtkiewicz showed that defendant was a member of the 9% of the black population which could have left the semen stains on the victim's bed sheets. Likewise, when viewed in conjunction with defendant's earlier admittance to Ramsey about calls made by him to Las Vegas, the victim's telephone bill constitutes circumstantial evidence that defendant was in the victim's house at 11:05 p.m. on the night of the victim's death. Other testimony revealed that defendant was in need of money. Even though the victim left New Orleans with more than $100 in her purse, no money was found in the victim's house when it was searched by the police after the murder. Furthermore, defendant's incriminating statements which were heard by Adams, Wright, and McMillin, when viewed in light of the testimony that the only criminal charge pending against defendant was for the second-degree murder of Daisy Parker Smith, further justify the jury in its conclusion that, beyond a reasonable doubt, defendant was guilty of the victim's murder.
Under the Jackson standard of review, we find that the trial court did not err in denying defendant's motion for a new trial and his motion for a post-verdict judgment of acquittal. Even under the thirteenth juror standard, it cannot be said that the trial court abused its discretion.
These assignments of error are without merit.

DECREE
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.