JiDOUCET, Chief Judge.
Defendant, Bobbie Clark, was indicted by a grand jury, on October 12,1994, for second degree murder in connection with the shooting death of her paramour of 12 years, Michael Sievers. She was arraigned and pled not guilty on November 8,1994. Following a trial before a 12 person jury held between February 13 and 22, 1996, defendant was found guilty as charged. Thereafter, on April 4,1996, defendant was sentenced to life at hard labor without benefit of parole, probation or suspension of sentence. Defendant filed 12 assignments of error in the trial court, July 11, 1995. However, on appeal, errors 8-12 have been abandoned; and errors 1-7 have been consolidated into five assignments, which we shall now consider. I ¡¿FACTS
In the interest of brevity, we pretermit the discussion of the facts at this point, relegating such discussion to defendant’s assignment of error number two, which argues insufficiency of the evidence.

ASSIGNMENT OF ERROR NO. 1:

By her first assignment of error, defendant contends she was denied a fair and impartial trial when the trial court denied her motion for change of venue. Clark submits there was a great deal of prejudice in the minds of the public and this affected the prospective jurors to such an extent that she could not get a fair trial in Avoyelles Parish. On February 18, 1995, defendant filed a motion for change of venue, and a hearing was held at which time the trial judge denied the motion.
La.Code CrimJP. art. 622 states:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
Official Revision Comment (b) to this article explains in part:
It is thus clear that the change of venue concept must be one which overrides the challenge for cause concept and is to be superimposed upon the entire proceeding. A change of venue ought to be available even though individually, each juror is not susceptible to a valid challenge for cause, if the defendant can show that overriding all of these things and superimposed upon all of them he still cannot get a fair trial. The change of venue concept should operate where the state of the public mind against the defendant is such that jurors will not completely answer honestly upon their voir dire, or witnesses will be so affected by the public atmosphere that they will not testify freely and frankly.
A change of venue shall be granted when a defendant proves that such prejudice exists *627 in the community and that a fair trial is impossible. State v. Neslo, 433 So.2d 73 (La.1983). This burden requires a showing of more than mere knowledge by the public of the facts surrounding the offense. State v. Giovanni, 409 So.2d 593 (La.1982). Whether defendant has made the requisite showing for a change of venue is a question addressed to the trial court’s sound discretion. State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). State v. Savage, 575 So.2d 478 (La.App. 3 Cir.), writ denied, 586 So.2d 556 (La.1991). However, a reviewing court may nevertheless make an independent evaluation of the facts to determine whether the accused received a trial which was free and unfettered by outside influences. State v. David, 425 So.2d 1241 (La.1983), cert. denied after remand, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986). In State v. Kahey, 436 So.2d 475, 481-482 (La.1983), the Louisiana Supreme Court stated:
The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors. Qualified jurors need not, however, be totally ignorant of the facts and issues involved. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court, [citations omitted.]
At the same time, the juror’s assurances that he is equal to this task cannot be dispositive of the accused’s rights. If the defendant can demonstrate the actual existence of a fixed opinion as to the defendant’s guilt, the individual juror may be excluded by a challenge for cause. If the defendant can demonstrate that actual prejudice, influence, or other reasons exist which will affect the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial, the court must take this into consideration in deciding whether to grant a change of venue, [citations omitted.]
Moreover, although extensive knowledge in the community of either the crimes or the putative criminal and his prior crimes is not in itself sufficient to render a trial constitutionally unfair, unfairness of a constitutional magnitude may be presumed so as to require a change of venue if the ‘trial atmosphere’ has been ‘utterly corrupted by press coverage.’ [citations omitted.]
LRelevant factors in considering whether to change venue are: (1) the nature of the pre-trial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and, (7) any factors likely to affect the candor and veracity of the prospective jurors. State v. Bell, 315 So.2d 307 (La.1975), appeal after remand, 346 So.2d 1090 (La.1977); Savage, 575 So.2d 478. The court may also consider the level of publicity in the area to which the venue could be changed; the care exercised and the ease encountered in selecting the jury; the prospective juror’s familiarity with, and the resultant effect of, the publicity; and the peremptory challenges and challenges for cause exercised by the defendant in jury selection. State v. Berry, 329 So.2d 728 (La.1976).
We note that at the hearing on the motion for change of venue, defendant submitted eleven newspaper articles and one hard copy of a television report that aired on KALB in Alexandria as evidence of the publicity surrounding her arrest and trial. The publicity coincided with significant steps in the prosecution of defendant, beginning with the commission of the crime on September 22, 1994. Newspaper articles appeared on September 23 and 24, 1994. Defendant’s indictment on October 12,1994, spawned stories on October 13 and 17, 1994. On November 8, 1994, defendant pled not guilty and this was noted in the press the following day. On January 23,1995, an article appeared about a ciernen- *628 cy hearing for Dennis Nall, defendant’s ex-lover and co-conspirator in the 1981 murder of defendant’s first husband. All further news items revolved around jury selection; six items appeared |r>from February 14-18, 1995. Some of these articles mention that jury selection was slow because of widespread knowledge in the community not only about the case, but also about defendant’s previous conviction. No evidence was presented on the area from which the jury was to be drawn. Furthermore, defendant has presented no statistics on the circulation of the Town Talk, in which the majority of the news items appeared. We have read the articles and we find they are mostly factual accounts of Clark’s prosecution. However, nine out of the twelve news items do mention defendant’s prior conviction for conspiracy to murder her first husband. As noted above in Kahey, 436 So.2d 475, extensive knowledge in the community of either the crimes or of the accused and his prior crimes is not in itself sufficient to render a trial constitutionally unfair.
We note that the seriousness of the crime should be underscored. Defendant killed her common-law husband by unloading a pistol into him. The press publicized that this was defendant’s second prosecution for the murder of a husband. That fact certainly would have contributed to the notoriety of the offense. Defendant presented no evidence of events in the community which would affect the attitude of the community toward defendant. State v. Wilkerson, 403 So.2d 652 (La.1981). While we note that various Sheriffs Department officials and the prosecutor released information to the press and were quoted in the news items, defendant failed to offer any evidence that such conduct affected the candor and veracity of the prospective jurors on voir dire. In State v. Wright, 593 So.2d 759 (La.App. 5 Cir.), writ denied, 599 So.2d 313 (La.1992), cert. denied, 506 U.S. 922, 113 S.Ct. 340, 121 L.Ed.2d 257 (1992), the court explained:
[T]he seriousness of the crimes Wright was charged with and the release of information to the local press by police officials ... are not of themselves sufficient to render a trial constitutionally unfair unless coupled with testimony of prospective jurors showing possible prejudice ^because of pretrial influences. There was no such showing. We again note, in finding that Wright’s jury was fair and indifferent, that appellant’s attorney approved of each juror and the two alternates and did not exhaust his peremptory challenges.
In the case sub judice, voir dire lasted five days. Defendant used only eleven of her twelve peremptory challenges. Furthermore, both the defendant and the prosecutor acknowledged that the trial judge went to great lengths in attempting to select an impartial jury. The trial judge explained his reasons for denying the motion for change of venue:
I have gone out of the way to dismiss jurors who could have legally been unchallengeable other than peremptorily.... [Ejvery person that I knew of that came close was excused before sometimes defense counsel even raised it. I did it on my own. I did the very best I could to empanel a neutral jury. There were many people excused and quite frankly it has shocked and disturbed me, the extent of abuse, spousal abuse in this parish. It disturbs me greatly. But those people I think were favorable to the defense and for one reason or another they were let go. But there’s not just this strong anti-defendant sentiment, there’s a lot of sentiment in this parish that could flow very easily toward the defendant in this matter. But out of 52, as Mr. Small said, 17 were excused for publicity reasons leaving 35 for other reasons. That’s twice as many. There are perhaps some of the jurors we questioned who did not answer truthfully.... But I allowed as extensive a voir dire by defense counsel as I have ever allowed or as I have ever participated in. And it was an extremely effective voir dire.... I truly believe that we have twelve people who have been honest in their responses and — fourteen people actually who know nothing about this case.... I cannot in good faith grant a change of venue because as I say in my heart I do know that I’ve done the best I can and I do feel that we have a good, competent, honest unbiased jury.
*629 We have reviewed the voir dire of the twelve jury members who convicted defendant. Each of them was questioned about any prior knowledge of the case through media or discussions with people. The twelve had been exposed to little or no publicity about the case. Those who had, did not recall any specifics about the case, nor had they formed any opinions as to guilt.
^Defendant’s argument leans heavily on how the publicity prejudiced particular jurors on voir dire. Ninety-two jurors were examined on voir dire. Fifty-two jurors were excused for cause. Of those, only seventeen were excused because of their familiarity with the case due to publicity. Two of those seventeen were Kyrle Roy and Thomas Neal.
During voir dire, prospective juror Kyrle Roy admitted he had read the newspaper accounts of the crime. Additionally, he admitted that on the first day of jury selection, state witness, Joey Marcotte, approached him and related that Clark had told Marcotte that she was going to shoot her husband. Roy further revealed having spoken with prospective juror Thomas Neal regarding Clark’s involvement in the prior crime of conspiracy to murder her first husband.
Neal was questioned about his knowledge of Clark’s prior conviction. At first, he denied any knowledge of Clark’s prior conviction. He also denied having had any conversations with anyone at the courthouse regarding this information. He then recanted and admitted to having had two or three conversations with groups of venire persons about whether Clark was guilty. Neal was also questioned about whether he had told Roy about Clark’s prior conviction. At first he also denied this, but he eventually admitted to having discussed with Roy that Clark had “done this before.” While it is evident that Neal at first lied about his knowledge of Clark’s prior conviction, he eventually admitted he had discussed the fact with some prospective jurors.
It was also discovered that Walt Sievers, the father of the victim, and state witness, Joey Marcotte, had discussed the case with some of the prospective jurors. Sievers was called before the court and was instructed to avoid any further communication with prospective jurors. At that point, Sievers told the court he knew [gtwo of the prospective jurors. They were excused. The trial judge, then inquired of all the prospective jurors whether anyone had approached them about the case before proceeding with voir dire. We find the above instances of disregard of the trial judge’s instructions were dealt with effectively and that it would be too broad an assumption to say the whole body of prospective jurors was prejudiced and/or could not be trusted based on the actions of four men.
In sum, defendant failed to show that the jurors selected were prejudiced by pretrial publicity. Most of the news articles appeared at the time of the commission of the murder, or shortly thereafter. While defendant’s prior conviction was mentioned in several articles, none of the jurors who served remembered any specifics about the case. Furthermore, the articles were mostly factual accounts of the crime and of the proceedings leading up to the defendant’s trial. Although the crime was covered by the area newspaper, it was not attended by other inflammatory factors such as racial strife, see State v. Bell, 346 So.2d 1090 (La.1977); murder of a law enforcement official, see State v. Felde, 382 So.2d 1384 (La.1980); or an egregious event such as a televised confession, see Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).
Additionally, in this case, the trial was not conducted in the “circus atmosphere” that was present in Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). On the contrary, the defendant and the victim were of the same race and lived together. Extensive knowledge in the community of the crime and the alleged criminal’s identity is not in itself sufficient to justify a presumption of partiality, and the trial atmosphere in this case was not utterly corrupted by the press coverage. The record of the voir dire reveals that the qualifications possessed by each juror selected in this case met or exceeded the minimum requirement that “the juror can lay aside |9his impression or opinion and render a verdict based on the evidence presented in court.” Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 *630 (1961). Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 2:

By her second assignment of error, defendant claims insufficiency of the evidence. When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See King, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983).
In order for the state to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. Defendant was convicted of second degree murder, a violation of La.R.S. 14:30.1 which states in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; ...
In this case, defendant does not contest that she shot and killed Michael Sievers. Rather she claims it was justifiable because she killed Sievers in self-defense. Self-defense is defined in La.R.S. 14:20 which states in part:
|10A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
When a defendant claims self-defense, the state has the burden of establishing beyond a reasonable doubt that defendant did not act in self-defense. State v. Brown, 414 So.2d 726 (La.1982). The state’s first witness was Walt Sievers who testified that his son, the victim, Michael Sievers, was six feet tall and weighed one hundred sixty-five pounds. Walt Sievers said that on the night of the murder, he had been at the Grand Casino, became intoxicated, and thereafter headed, with a friend, to a bar in Belledeau. At the bar, he met Mike, who drove Walt to Mike and Bobbie’s home. They proceeded into the house and Mike told Bobbie that his father was going to spend the night. Defendant protested this plan, and Walt turned around, exited the house and began walking home. Walt stated that while walking away, he did not hear any screaming or hollering. However, he stated that when he was about one hundred feet away from the house, he heard gunshots. The shots stopped for a moment and then started up again. Walt said he went to a neighbor’s house and by the time he returned to his son’s house, a police unit had arrived.
On cross-examination of Walt, the defense attorney pointed out that the autopsy report stated Mike’s height to be six feet five inches and his weight two hundred pounds. Walt disagreed with the report. Walt further stated he was probably intoxicated at the time of the shooting, and he conceded he cursed the police officers and struck one of them after he returned from the neighbor’s house and was denied entry into his son’s home.
Jody Galland, a 911 Avoyelles employee, received a telephone call from defendant at 1:57 in the morning. Ms. Galland testified that the defendant, Ms. Clark, [uasked to have someone sent to her residence to help her because she had shot someone and then abruptly hung up. Two or three minutes later Clark called back and Galland obtained more information about the shooting. Defendant told Galland that Michael had been out drinking, and had returned home with his father, who had also been imbibing. They started arguing and Michael started beating her. Defendant went on to say she just wanted him to stop; and that she shot him seven times, unloading a gun on him. Gal-land asked if Sievers was breathing and asked defendant to check Sievers’ vital signs. *631 Clark reported she could find no pulse. Gal-land, then, asked Clark to put her ear by his mouth to hear or feel if he was breathing. At that point, defendant began screaming. She said he was face down and she did not want to roll him over because she was afraid he was going to hurt her again.
On cross-examination, Galland stated defendant’s voice was shaky, she was crying, screaming and, was also breathing very hard.
Avoyelles Parish Deputy Sheriff Charles Jenkins was the first to arrive on the scene. He saw defendant standing in the doorway with a phone in one hand and a pistol in the other. He secured the pistol from defendant and checked for a pulse on the victim, but could find none. More officers, then, arrived on the scene. Jenkins said the defendant, whose body was still warm, was bent over the sofa in a kneeling position, the top part of his body on the sofa, the bottom part on the floor. He and the other officers began securing the scene and taking pictures. The victim’s father arrived and was cursing and trying to go to the sofa. Deputy Jenkins and Officer Tigner pulled him out of the residence and restrained him. Jenkins spoke to Clark who told him that her husband and his father came home, her husband started fussing at her, and the father left. She said she went outside to try to persuade the father to | i ¿return, but she could not get him to come back in the house. She further explained she was feeling bad and had been taking medication. Clark said when she reentered the kitchen, the victim grabbed her by her left wrist, and struck her across the side of her face. Defendant remembered she had a gun in her purse, retrieved it and fired it until it was empty.
Deputy Jenkins said he looked at her face and saw no redness or swelling. Jenkins, then, had the officer who was photographing the crime scene take a photo of the left side of defendant’s face, as well as pictures of the scene and the body before the ambulance arrived. He also marked the spots where projectiles or casings were found. Jenkins said when the body was removed, he noticed a phone on the floor where Sievers had been.
Joseph Kimble, son of the defendant, said his mother had been living with the victim. Kimble described Sievers as about six feet tall and weighing about one hundred and sixty pounds. He said when he saw his mother on September 24, two days after the incident, he looked at the left side of her face, but did not see any bruising or marks. Defendant, who was released on bail on September 28, asked Kimble, the following day, to go to the house and get some cash that she had hidden in various places in the house. He said defendant told him that the money was what she had saved in case she had to get away from her husband when they were arguing. She called it her get-away stash. Kimble said he collected the money, which he guessed was between three and five hundred dollars, and gave it to his mother. On cross-examination, he stated he understood that his mother had the money stashed so she could get a motel room when she and Sievers were fighting.
Avoyelles Parish Sheriffs Detective Ed Walker arrived at the crime scene about 2:30 in the morning. He stated he spoke with the defendant who told him that 113she was sitting on the couch when her husband came home and told her they had a house guest, his father. She walked toward him and told him that supper was on the stove and she was not feeling well so she was going to make up a bed for his dad, and that she did not want to stay up all night talking to two drunks. She, then, went to the back bedroom to fix the bed. When she came out to where Michael was, his father was gone. The defendant asked where his father was and Michael told her his father had left because he did not like what she had said about staying up all night talking to two drunks. Ms. Clark stated she went out to the carport where she met Walt Sievers and asked him to come back inside. He refused and walked away from her. She returned inside and told Michael that she could not get him to come in. Clark told Detective Walker that Michael fussed at her and shoved her. She then went to the living room and sat down on the sofa. Michael followed her to the living room and struck her one time with his fist. Her purse was next to her on the floor. She stuck her hand inside it and Michael hit her again. Detective Walker *632 said Clark told him the third time Michael went to hit her, she pulled out the pistol and shot him seven times. Walker said the defendant told him she was seated on one end of the sofa when the shooting occurred. He further stated that she said after she shot Sievers she picked up the phone to call the sheriffs office and dialed 253 but she could not get a dial tone because the phone was broken into two pieces.
The state showed Detective Walker a photograph of the living room with circles drawn around the locations where projectiles or casings from the shooting were found. One of the circles was at the end of the sofa where defendant had been sitting. Detective Walker identified another photograph depicting a projectile that was found in the hallway. Walker said he advised defendant of her Miranda rights and that she signed a Waiver of Rights form prior to his taking a taped statement from | i4her. The state then played the tape-recorded statement for the jury. In the statement, Clark recounted that after trying to get Walt Sievers to spend the night, she came in from the carport and Michael started screaming at her and pushing her in the office. She said she told Michael to go get his father and she went into the living room to sit on the couch. She said she was going to go fix the beds but Michael followed her into the living room hollering and screaming at her. She said he hit her and she told him not to hit her again. She reached her purse and put her hand in it. Clark said Michael hit her again and she pulled the gun out of her purse. When he started to hit her a third time, she backed up and began pulling the trigger on the gun, shooting him seven times. She said she tried to call the police from the kitchen phone but it did not go through. She then noticed that the phone by Michael was off the hook. She detached it from the wall jack, ran back in the kitchen and called the police. She said she then called her mother, before calling the police again and staying on the phone. Clark stated she could not remember if she was sitting on the couch when she shot Michael or if she was standing or perched on the edge. She stated that when Michael had hit her before, she usually left and stayed elsewhere until he sobered up. Detective Walker testified that he found no bruises on the defendant.
On cross-examination, Detective Walker agreed that Clark told him that Michael had not struck her in the office, but that he had grabbed her there. Walker said Clark told him the actual blows took place in the living room. After taking Clark’s statement, Walker did not see her again. On re-direct, he reiterated that he did not see any redness on either the left side of Clark’s face or on her arm.
Avoyelles Parish Sheriffs Detective Elden Says arrived on the scene to gather evidence, photograph and do a sketch of the scene. He, also, said he saw no redness | iSor bruises on Clark the morning of the incident. Says did not see Clark again until weeks later.
Brent Hemandbz, the Avoyelles Parish Sheriffs officer who booked Clark the morning of the incident, also stated he noticed no redness or bruising on her face. Hernandez admitted he had not been told to check for any redness or bruises. He said he had no way of knowing whether Clark had bruising on her left cheek on September 25, three days after the incident.
Angela Hardy, a nurse at the Correctional Center for Women in Bordelonville, conducted a physical of Clark when she was admitted on September 22, 1994. Ms. Hardy said Clark’s skin color was normal and no bruises were noted. Hardy testified that she knew Clark contended that she had been struck in the face, so she looked particularly at defendant’s face.
On cross-examination, Ms. Hardy stated defendant complained of headaches and told her she had seen a doctor the day before from whom she had received a prescription for Ceclor®. Clark was allowed to continue receiving this medication during her incarceration.
Ms. Hardy stated another nurse at the Correctional Center, Rebecca Ferguson, noted in Clark’s chart on September 25, 1994, that Clark complained, “I was hit in the face and head and it hints.” Ms. Ferguson recorded in Ms. Clark’s chart that defendant had bruising to the face. The chart also *633 indicates 400 mg. of ibuprofen were administered to Clark for pain and swelling. On redirect Hardy indicated that Clark’s chart shows no other complaints between September 22,1994 and September 25,1994.
Rebecca Ferguson, the other nurse at the Avoyelles Bordelonville Correctional Center, said she saw and spoke to Clark on September 25, 1994. Ferguson said Clark | ificomplained of pain in the head and face resulting from a blow to these parts. Ferguson noted a bruise on the left side of Clark’s face and administered Ibuprofen. Ferguson said September 25, 1994, was the first time defendant complained and the bruise she observed was about the size of a quarter.
Joey Marcotte, a truck driver formerly employed by Clark and Sievers, maintained a friendly relationship with the couple after ceasing to work for them in late 1993 or early 1994. Marcotte said he visited with the defendant about two or three weeks before she killed Sievers. Marcotte stated he spoke to her in her kitchen where she told him that her husband (nicknamed “Slim”) was beating her up. Marcotte said he asked her why there weren’t any marks if Sievers was beating her up so much. Clark replied that they were all in her stomach, and the next time Sievers beat her she was going to shoot him. Marcotte said that Michael Sievers was called “Slim” because he was skinny — six feet tall and about 160 pounds. He said he had seen and spoken with Sievers at about 11:00 pm. on the night of September 21, 1994, a few hours before Sievers was killed. Marcotte said he and Sievers were at a bar but Sievers did not appear to be drunk as he neither staggered nor mumbled. Marcotte said he had never seen Clark or Sievers hit the other but when they argued they would holler and scream.
On cross-examination, Marcotte stated the defendant was very emotional when she told him about Sievers beating up on her a few weeks before the killing. Marcotte said that was the only time she had ever mentioned Sievers beating her.
Charlotte Hockersmith, daughter of the defendant, also testified. Ms. Hockersmith stated she had lived with Clark and Sievers from the end of June to the end of September of 1992. She said Clark and Sievers’ relationship seemed business-oriented but that they also cared for each other. She confirmed that when they argued |17it got heated and they were both loud. Hockers-mith further stated she saw Sievers strike her mother once during that time, in July 1992. She said following that incident Clark left the house and went down the road to a country store where she used the phone to call someone to see if she could stay with them. Hockersmith, then, stayed with her sister for a day or two. This witness described Sievers as six feet tall and weighing about 160 pounds.
In April 1994, Hockersmith and her husband purchased a home in Vicks, Louisiana from defendant’s mother. Charlotte’s mother, the defendant, had been using one room of the house when she needed it. When Hockersmith and her husband moved in, they let Clark keep the room upstairs in the house. On May 25, 1994, Clark and Hock-ersmith’s husband were shooting targets in the backyard of the home. Charlotte said Clark’s gun jammed and the next day Clark bought a new gun which Hockersmith identified as the one in evidence at the trial. Charlotte further recalled a conversation she had with her mother in August 1994, in which she asked her mother if she was going to leave Sievers. During that conversation, Clark showed her daughter a large bruise on her lower thigh and told her, “If he does it again, I’m going to kill him, and when he least expects it, not when he’s hitting me where he can get the gun, when he least expects it.” Charlotte said she asked her mother why Sievers hit her and Clark said that it was the only way he showed any emotions or affection toward her. Clark then said to Hockersmith, “If my gun won’t do it, I know you have one that would.” Charlotte said when she saw her mother shortly after the shooting of Sievers, she looked at the left side of her mother’s face and did not see any bruising or redness there.
On cross-examination, Hockersmith said that during the months between April and September 1994, her mother would use the house from time to time, often on *634 | ^weekends when Hockersmith and her hus-° band would go to their camp. She said she thought her mother stayed there when there was trouble between her and Sievers. Charlotte said when she went to see her mother during the morning hours of September 22, 1994, her mother had a broken bracelet and a bent earring in her hand. She said her mother’s face was not swollen or red at three a.m. when she arrived at the scene; nor was it red or swollen at five or six a.m. that morning when she was with her mother at the sheriff’s office.
On re-direct examination, Hockersmith recalled that, in July 1992, she saw her mother forty-five minutes after witnessing Sievers hit her. Charlotte said her mother’s face was red and swollen at that time. She further stated that the bruise she had seen on her mother’s outer thigh the day after Clark said Sievers beat her, was very large, purple and blackish.
Wanda Simon and her husband were employed by Clark and Sievers and lived next door to them after March 1994. Simon said she went to their house almost everyday until August 1994, at which time Simon and her husband stopped working for the couple. Simon said Clark and Sievers’ arguments were loud with each hollering and screaming at the other. Simon said she never saw any physical altercations nor did she ever see Clark battered in any way. However, she did state that she remembered an alleged incident where Clark fell out of one of the big trucks and bruised her right leg. She said she did not actually see Clark fall out of the truck, but was told that is what happened when, seeing Clark on crutches, she asked Clark what happened. Simon described Sievers as six feet tall and weighed about 165-170 pounds. She said he often drank in the evening until he went to bed.
The next witness, Charles Iverson worked for Clark and Sievers from November 1992 until September 1994. He became friends with both and worked linear their home almost seven days a week. Iverson said Sievers’ and Clark’s arguments were loud and both participated. He stated that when Sievers was unavailable at work, Clark would help unload, change tires, and assist the mechanics. Iverson said that in late July or early August 1994, he witnessed Clark slip and fall out of one of the trucks injuring her leg around her knee. Iverson stated the day of the accident and the area was red and swollen, and thereafter it developed into a five-inch bruise. After the injury she used a pair of crutches and a lawn mower to get around. Iverson said that during the two weeks preceding Sievers’ death, he twice saw defendant practicing shooting a target.
Dr. Brenda Reames, the forensic pathologist who conducted the autopsy of Sievers, explained that the height and weight of the victim were only estimations and often incorrect. Reames said Sievers’ blood alcohol content at the time of the autopsy was 0.15, well above the 0.10 level, considered to be legally intoxicated.
Patrick Lane, an expert in firearms identification, stated that in his opinion the shots had been fired at a distance greater than three feet, but he could not say how much greater a distance.
The defense called David Jones, a former employee of defendant and the victim for three months in 1993. He said he twice heard Clark and Sievers arguing. Jones said Sievers was doing the arguing. Jones further said he often saw Sievers drinking and that he was mean when he drank.
Joseph Tony Johnson, who worked, on and off, for Clark and Sievers for three years, was next to testify. When asked to describe their relationship he replied, “To me it wasn’t no relationship” [sic]. He stated that when Sievers spoke to Clark he would always raise his voice to her. Johnson said he witnessed Sievers push Clark once. He also stated that he often saw Sievers drinking whiskey after work and on ^weekends. Johnson further stated that alcohol seemed to make Sievers violent, evidenced by his hollering instead of conversing normally while he was drinking.
Walter Leonard worked for Sievers and Clark for a month in 1991, and lived with them for a couple of the weeks during the employment. Leonard said during that time, he saw Sievers hit Clark once. He further stated that on a separate occasion while Siev-ers and Clark were arguing he heard Sievers *635 hit Clark. The next day, he observed Clark had a black eye. On cross-examination, Leonard said he was eight to ten feet from Sievers and Clark on the second occasion when he heard the hit. He further admitted he had on the television at that time.
Dr. Bryan McCann testified he treated Clark on July 9, 1992 for a blow to the right lower jaw. He said the diagnosis was a probable fracture to the left jawbone and that the injury could have been caused by a blow to the right jaw. He further testified he saw the defendant again on September 29, 1994, at which time she complained of having been hit in the left jaw the week previous. During that visit, Dr. McCann noted a slight swelling and red-purple discoloration on the left cheekbone. Dr. McCann said that as a general rule, if someone is struck on the left side of the face, he would expect some discoloration within the next five to seven horns. However, he added that on occasion he has seen bruising a day or two later. McCann opined that if someone is hit on the side of the face near the hairline, the bruising could occur under the hair line and thus, not be visible. He further stated that gravity would likely cause the bruising to travel downward, possibly two or three days later. Dr. McCann agreed that, if the injury to Clark’s face he treated on September 29 had occurred a week previous, redness and swelling should have developed during the five to nine hours following the blow. He further stated he would expect bruising on her cheek. McCann said he found no inconsistencies | aibetween the results of his medical examinations of Clark and her histories of the injuries. He further said that if someone is hit in the face, it is possible that the evidence would not appear till several days later.
Finally, Florence Gauthier, the nurse working with Dr. McCann when defendant came in on both occasions, July 9, 1992, and September 29, 1994, noted Clark had discoloration and swelling of the jaw on the left side of her face on each of those visits.
As one can see from the testimony and evidence presented, the jury was required to evaluate facts which support both the state’s theory of the case, that defendant had the specific intent to kill Michael Sievers when she emptied her pistol into him, and the defendant’s claim that she did so, only in self defense, being convinced that she was in imminent danger of losing her life or receiving great bodily harm and that the killing was necessary to save herself from that danger. See La.R.S. 14:30.1 and La.R.S. 14:20. The resolution of a matter where conflicting testimony exists requires a determination of credibility of the witnesses. Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. A reviewing court is precluded from reversing credibility determinations in the absence of manifest error. State v. Nolan, 503 So.2d 1186 (La.App. 3 Cir.), writ denied, 507 So.2d 226 (La.1987).
In State v. Mussall, 523 So.2d 1305 (La.1988), the Louisiana Supreme Court expounded on the Constitutional protections against erroneous conviction afforded an accused. The court explained as follows:
The United States Supreme Court has explicitly held that the Due Process Clause of the Fourteenth Amendment protects each person accused of a crime against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. In re Winship, 397 U.S. 358, 368, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368, 377-78 (1970)....
⅛⅛ Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court granted certiorari to consider the petitioner’s claim that under In re Winship, supra, a federal habeas corpus court must consider not whether there was any evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt....
The principal criterion of a Jackson v. Virginia review is rationality. This is because under Winship and Jackson Fourteenth Amendment due process demands that in state trials, as has been demanded traditionally in federal trials, a criminal conviction cannot constitutionally stand if it is based on a record from which no rational trier of fact could find guilt be *636 yond a reasonable doubt. Accordingly, under the Jackson methodology a reviewing court is required to view the evidence from the perspective of a hypothetical rational trier of fact in determining whether such an unconstitutional conviction has occurred. In reviewing the evidence, the whole record must be considered because a rational trier of fact would consider all of the evidence, and the actual trier of fact is presumed to have acted rationally until it appears otherwise. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted. Thus, irra’tional decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. [Footnotes omitted].
Id, at 1308-1310.
Viewing the evidence in the light most favorable to the prosecution, we find: (1) a rational trier of fact could have found the essential elements of the crime of second degree murder proven beyond a reasonable doubt; and (2) a rational trier of fact could have likewise found that the defendant was not in imminent danger of losing her life or receiving great bodily harm and that the killing of the victim was necessary to save herself from that danger. Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 3:

By her third assignment of error, defendant contends the trial court abused its discretion in excluding expert and lay testimony regarding specific acts of prior 12⅞violent behavior committed by Michael Sievers against Bobbie Clark. Defendant claims she was denied her constitutional right to present a defense. Clark refers specifically to particular portions of the testimonies of lay witnesses Shirley Morgan, David Jones and Joseph Johnson. When the defense attempted to elicit these witnesses’ accounts of abusive behavior, the State objected and the trial judge sustained the objections finding no foundation had been laid concerning the relevancy or trustworthiness of the testimony. The trial judge explained that the witnesses could not testify to bruises or injuries they saw on Clark unless there was a connexity between the injuries and Sievers. Defense claimed the witnesses were told by either Clark or an employee of Sievers’ and Clark’s business that Sievers had inflicted the injuries on Clark. The trial judge ruled the statements were inadmissible hearsay because they were unreliable and self-serving.
Concerning the expert testimony, defendant sought to introduce Dr. Bernard Patty’s report of an office visit on December 21, 1984, in which it was noted defendant was struck in the right eye. The report did not state that the person inflicting the injury was Sievers. The trial judge found the evidence irrelevant. He also refused to allow a psychiatrist’s testimony concerning hearsay statements made to him by the defendant. See pretrial writ affirming the trial court’s ruling, State v. Clark, 95-214 (La.App. 3 Cir. 2/17/95).
A defendant in a criminal case is constitutionally guaranteed the right to present a defense. However, this guarantee does not grant the right to the admission of any type of evidence. State v. Hill, 610 So.2d 1080 (La.App. 3 Cir.1992). While the rules of evidence are often invoked to regulate admission of testimony, in rare cases, “where [an] ... evidentiary rule impermissibly impairs the defendant’s right to present a defense, the evidence still should be admitted.” Id. at 1086.
_]¾⅛ State v. Gremillion, 542 So.2d 1074, 1078-1079 (La.1989) the court explained:
While hearsay should generally be excluded, if it is reliable and trustworthy and its exclusion would interfere with the defendant’s constitutional right to present a defense, it should be admitted. Louisiana Code of Evidence, art. 804(B)(6) provides:
‘In a civil case, a statement not specifically covered by any of the foregoing exceptions if the court determines that considering all pertinent circumstances in the particular case the statement is trustworthy, and the proponent of the *637 evidence has adduced or made a reasonable effort to adduce all other admissible evidence to establish the fact to which the proffered statement relates and the proponent of the statement makes known in writing to the adverse party and to the court his intention to offer the statement and the particulars of it, including the name and address of the declarant, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it. If, under the circumstances of a particular case, giving of this notice was not practicable or failure to give notice is found by the court to have been excusable, the court may authorize a delayed notice to be given, and in that event the opposing party is entitled to a recess, continuance, or other appropriate relief sufficient to enable him to prepare to meet the evidence.’
While this article specifically limits its application to civil cases, comment (d) states:
‘Although the exception set forth in this Subparagraph is limited to civil cases, under certain circumstances results similar to those authorized by this exception may be mandated by the right of compulsory process when an accused in a criminal case offers reliable trustworthy evidence not fitting within the contours of a legislatively recognized exception to the hearsay rule. See Chambers v. Mississippi, 410 U.S. 284 [93 S.Ct. 1038, 35 L.Ed.2d 297] (1973); Green v. Georgia, 442 U.S. 95 [99 S.Ct. 2150, 60 L.Ed.2d 738] (1979); State v. Webb, 424 So.2d 233 (La.1982); State v. Washington, 386 So.2d 1368 (La.1980).’
... Defendant has a constitutional right to present a defense. La. Const, art. 1, § 16.
125Pefendant presented no evidence that the testimonies of the experts and the lay witnesses she sought to have introduced were trustworthy as required by La.Code Evid. art. 804(B)(6) and Gremillion. The anonymous employee to which defendant referred in her brief and Clark herself would have been the proper witnesses to testify concerning the incidences of assaultive behavior and the resulting injuries.
Furthermore, defendant was not prohibited from presenting her defense. Testimony was elicited from Dr. McCann and a number of other witnesses concerning prior acts of assaultive behavior by the victim toward the defendant. State v. Martin, 582 So.2d 306 (La.App. 1 Cir.), writ denied, 588 So.2d 113 (1991). Thus, the trial court did not err in its ruling and this assignment of error also lacks merit.

ASSIGNMENT OF ERROR NO. 4:

By her fourth assignment of error, defendant claims the trial court erred in ruling that if defendant, or her expert witness, Dr. Ware, took the stand to testify regarding her prior abusive relationship, the state could cross-examine both the defendant and Dr. Ware about the defendant’s prior relationship with Guy Kimball and the defendant regarding her prior conviction in connection with said relationship. In State v. Tassin, 536 So.2d 402, 408 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989), the court-stated:
A defendant places his credibility at issue when he takes the stand. Like any other witness, his credibility can be impeached by showing that his general reputation for truth or moral character is bad, that he ‘is biased, has an interest, ... has been corrupted’, or that he has previously been convicted of a crime. State v. Nash, 475 So.2d 752 (La.1985). [Footnotes omitted.]
Defendant bases her argument on La.Code Evid. art. 403 which states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
|26We find that although the evidence of Clark’s prior conviction and relationship with Kimball is most certainly prejudicial, it is not unfairly so. Furthermore, the Gremillion exception has not been applied to a case in which defendant claims her right against self-incrimination has been infringed.
*638 In State v. Hill, 610 So.2d 1080 (La.App. 3 Cir.1992), the state introduced inculpatory statements of the defendant during the testimony of Avoyelles Parish Sheriffs Detective Lemoine. The statements were allowed in evidence pursuant to La.Code Evid. art. 801(D)(2)(a). On cross-examination, the defendant attempted to have Lemoine testify to exculpatory statements made by Hill years previously, but within the confines of the investigation of the crime. The defendant in Hill claimed that, by not allowing the exculpatory statements into the record, defendant would have to testify and impeach himself. In addressing defendant’s claim, a panel of this court stated:
In State v. Gremillion, 642 So.2d 1074 (La.1989), the court held that an otherwise inadmissible hearsay statement which does not fit into one of the recognized exceptions to the hearsay rule should be admitted if it is reliable and trustworthy and to exclude it would interfere with defendant’s constitutional right to present a defense. In State v. Martin, 582 So.2d 306 (La.App. 1st Cir.1991), writ denied, 588 So.2d 113 (La.1991), the court found that ‘even if the Louisiana Code of Evidence prohibits the introduction of certain testimony, in those rare cases where the evidentiary rule im-permissibly impairs the defendant’s right to present a defense, the evidence still should be admitted’. The court then declined to apply this narrow jurisprudentially created exception to that particular case because it found that the defendants therein were not prohibited from presenting their defense. Constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence, only that which is deemed trustworthy and has probative value. State v. Scott, 588 So.2d 1365 (La.App. 2d Cir.1991), writ denied, 592 So.2d 1298 (La.1992).
The narrow exception, referred to above, should be sparingly applied and has only been applied in the Gremillion case where the court found the existence of exceptional circumstances in that, by not allowing the defendant to place the statement before the jury, the trial court impermissibly impaired his constitutional right to present a defense to the crime charged. The exception has not been applied to aj^case such as the one before us wherein defendant claims that his right against self-incrimination, i.e., to not testify if he so chooses, has been infringed. [Footnote omitted.]
Id. at 1086.
Thus this court affirmed the trial court’s ruling that defendant’s contentions had no merit and held that the statements defendant sought to have introduced were not reliable or trustworthy.
In the case sub judice, there has been no showing that the testimony defendant sought to have introduced was reliable or trustworthy. Furthermore, defendant was able to present her defense through Dr. McCann and others, who recounted some of the history of Sievers’ assaultive behavior. Clark wanted to take the stand to re-urge her self-defense theory without having relevant, albeit damaging, information presented on her prior relationship with Guy Kimball, her first husband, and her conviction in connection with his murder. Considering the circumstances, we find Clark’s defense was not impaired and this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 5:

By her fifth assignment of error, defendant claims the trial court erred in denying her the right to present her tape recorded statement to law enforcement officers during the presentation of the defense’s casein-chief. The tape recorded statement, defendant’s explanation of what happened, had already been played for the jury during the state’s case-in-chief. It had been taped a few hours after the shooting occurred. The trial court found that the replaying of the tape would be repetitive.
As noted in previous assignments, La. Const, art. I, § 16 guarantees a defendant in a criminal case the right to present a defense. La.Code Evid. art. 103 states that “[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.... ” La.Code Evid. art. 611(A)(2) Instates, in part, that “[t]he court ... shall exercise reasonable control over the mode and order of *639 interrogating witnesses and presenting evidence so as to ... [a]void needless consumption of time_” In State v. Ellis, 94-599, p. 22 (La.App. 5 Cir. 5/30/95), 657 So.2d 341, 353, the court noted that “[t]he questions of relevancy and admissibility are within the wide discretion of the trial judge. His determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion. State v. Mosby, 595 So.2d 1135 (La.1992); State v. Mayeaux, 570 So.2d 185 (La.App. 5th Cir.1990), writ denied, 575 So.2d 386 (La.1991).” The trial judge controls the flow of the case and his decision to disallow repetitive testimony should be upheld. The substance of Clark’s tape-recorded statement was that she shot and killed Sievers because she was in danger of receiving great bodily harm or being killed. It is clear that defendant’s theory of self-defense was presented to the jury when the tape was played during the state’s casein-chief, as well as through the testimonies of Deputy Jody Galland, Lieutenant Charles Jenkins, and Detective Ed Walker. Walker, who had recorded defendant’s statement, testified that he obtained an oral statement from Clark shortly after the shooting, and prior to the recorded statement, which agreed with her later taped statement. Defendant has not explained how the denial of her request to replay the tape violated her constitutional right to present a defense. The statement was self-serving hearsay ex-cludable under La.Code Evid. art. 801. Because defendant chose not to take the stand, La.Code Evid. art. 801(D)(1) was unavailable to her. Furthermore, defendant has made no showing that the evidence falls within the narrowly drawn hearsay exception enunciated in Gremillion, 542 So.2d 1074. Accordingly, we find this assignment of error, likewise, lacks merit.
129 CONCLUSION:
In sum, we find the trial judge properly denied defendant a change of venue. Sufficient evidence existed to convict defendant of second degree murder. The trial judge properly found inadmissible the hearsay statements of defendant’s lay and expert witnesses and did not err in refusing to allow defendant to replay her recorded statement during her ease-in-chief. Thus, this appeal has no merit and defendant’s conviction and sentence is affirmed.

AFFIRMED.